JAMES M. FULTON, Appellant, v. JOSEPH L. FREELAND et al.

Division One, April 13, 1909.

1. **WILL CONTEST: Undue Influence: Former Illicit Relations With Beneficiary.** Where testator was divorced from his first wife (plaintiff's mother) in April, 1881, and was married to defendant in October, 1881, and made his will in 1889, giving all his property to the second wife, or in case of her prior death to her daughter (his stepdaughter), evidence of illicit relations existing between testator and the second wife from 1876 up to the date of their marriage in 1881 and while the first wife was yet living, is too remote to be competent on the issue of undue influence exercised by her.

2. ————: **Incapacity: Delusion: Founded on Facts.** There is no such thing as a delusion founded on facts. If testator, nine years before the execution of his will, entertained an idea that his former wife (plaintiff's mother) and her relatives had entered into a conspiracy to injure and perhaps kill him, and that plaintiff (his son) in a way shared in that conspiracy, and later he formed and entertained an opinion that the

Fulton v. Freeland.

plaintiff was bent upon breaking him up and injuring him, and there is evidence going to show a substantial basis for those opinions, though there may have been a misjudgment of the facts or the opinion may have been accentuated, it was not a delusion, and does not tend, in the face of the unquestioned fact that at the time of the execution of the will he was of sound and disposing mind, to establish incapacity, though the son was disinherited by the will.

3. ————: **Undue Influence: All Property to Wife: Presumption.** The fact that the wife is the sole beneficiary under her husband's will raises no presumption of undue influence on her part. Nor can that presumption arise from a showing that some feeling existed between her and plaintiff (his son by a former marriage), where a foundation for that feeling is shown. And where it is not shown that the wife ever mentioned to testator the making of a will, but on the contrary the evidence shows that the will was dictated by him, that she was not present at its execution, that she did not know of its existence for sometime afterwards, that he kept it absolutely under his control for years, with ample opportunity and mental capacity to change it but did not, and that after its execution he talked of it to his friends and business associates and expressed satisfaction with its terms, there is no proof of undue influence on her part that would authorize a submission of the question to the jury.

4. ————: ————: **Exclusion of Evidence.** Where all the excluded evidence is in the record, it will be considered as if admitted in determining whether or not the court should have submitted the case to the jury; and if, considering it at its full value, it would not establish undue influence, it will be held that it was properly excluded.

5. ————: ————: ————: **Meretricious Relations: Presumption.** Where a testator who made a will in favor of a wife with whom prior to marriage he maintained meretricious relations, is shown to be of sound and disposing mind at the time the will was executed, and there is an entire absence of any direct influence on her part in the procuration of his will, no presumption arises of undue influence; and evidence which goes to show such meretricious relations, and nothing more, in the face of the unquestioned fact of his sound and disposing mind at the time of the will's execution, should be excluded.

Appeal from Holt Circuit Court.—*Hon. W. C. Ellison,* Judge.

AFFIRMED.

*F. C. Dungan, C. F. Booher* and *Geo. W. Wright* for appellant.

(1) The court erred in rejecting and refusing to admit competent and material evidence offered by plaintiff. Baldwin v. Robinson, 53 N. W. 531; Shepardson v. Potter, 18 N. W. 575; Haynes v. Hayden, 95 Mich. 332; In re Schell's Estate, 28 Colo. 168; Clough v. Clough, 10 Colo. App. 443; In re Flint's Estate, 100 Cal. 391; In re Rufino, 116 Cal. 316; Potter v. Baldwin, 133 Mass. 427; Ketchum v. Stearns, 76 Mo. 396; Sunderland v. Hood, 84 Mo. 293; Fingley v. Cowgill, 48 Mo. 296; Cowgill v. Kennedy, 24 So. 459; Davis v. Calvert, 5 G. & J. 269; Johnson's Estate, 159 Pa. St. 631; In re Segur's Will, 44 Atl. 342; Dunaway v. Smook, 67 S. W. 62; Stacer v. Hogan, 120 Ind. 207; Steadman v. Steadman, 140 Atl. 406; Powers v. Powers, 78 S. W. 152; Baker v. Baker, 202 Ill. 595. The authorities are collected in In re Hess's Will, 31 Am. St. Rep. 665. (2) In giving to the jury the peremptory instruction in the nature of a demurrer to the evidence at the close of the whole case. Mowry v. Norman (Mo.), 103 S. W. 15; Meier v. Buchter, 197 Mo. 68; Bradford v. Blossom, 190 Mo. 139; Roberts v. Bartlett, 190 Mo. 709; Taylor v. Welburn, 20 Mo. 310.

*J. W. Peery* for respondents.

(1) The court did not err in excluding the evidence, by which it was sought to show improper relations between the testator and his second wife, before their marriage, and the trouble between him and his first wife, and his treatment of the latter, before and during the pendency of the divorce suit. All of this evidence, and the incidents related in it, referred to a period of time, from eight to thirteen years, before the execution of the will, and from twenty-one to twenty-six years before the death of the testator. Such evidence could throw no possible light on the mental con-

dition of the testator, at the date of the will, or thereaf-
ter, and its only effect, if admitted in evidence, would
have been to fill the record with false issues, and excite
the prejudice of the jury.   Ketchum v. Stearns, 8 Mo.
App. 66, 76 Mo. 396; Pierce v. Pierce, 38 Mich. 412;
Batchelder v. Batchelder, 139 Mass. 1; Flint's Estate,
100 Cal. 391; Weber v. Sullivan, 58 Iowa 260; Herwick
v. Langford, 108 Cal. 608; In re Shell's Est., 28 Colo.
163; 1 Underhill, Wills, p. 213; Gardner on Wills, p.
203; Mitchell v. Donohue, 100 Cal. 202; Story v. Story,
188 Mo. 127; In re Kaufman, 117 Cal. 288; Maddox v.
Maddox, 114 Mo. 35; Hughes v. Rader, 183 Mo. 630;
Garland v. Smith, 127 Mo. 567; Sunderland v. Hood, 13
Mo. App. 232, 84 Mo. 293.   But again, plaintiff intro-
duced in evidence the record in the divorce proceedings
and by the decree of the court, entered in that case,
every question which he sought to raise by the excluded
evidence was solemnly adjudicated and conclusively
settled in favor of the testator and the woman who
afterward became his wife. It seems to us that this evi-
dence, introduced by plaintiff, is conclusive of the facts
sought to be proven, and that in any event he would
have no right to complain.   Story v. Story, 188 Mo.
110.    (2)   This court will not review the action of the
trial court in the giving or the refusal of a peremptory
instruction unless all the evidence, upon which that
court passed, is set out in the abstract.   It is not suf-
ficient to present merely the substance of the evidence,
as is done in this case.   And where, as here, an ab-
stract shows upon its face that the evidence is incom-
plete; that it is disconnected, and parts of it show that
other evidence was given by the witness, which is not
set out; and especially, where the respondent shows,
as we have, by the comparative statement of the bill of
exceptions with the printed abstract, that not nearly
one-half of the evidence has been printed, this court

219 Sup.—32

will not pass upon the question. The presumptions are all in favor of the validity of the judgment, and the appellant can not shift the burden of preparing an abstract of the record onto the respondent. The court will assume that the omitted evidence was of controlling force, and that the action of the trial court was justified by it. Reed v. Peck, 163 Mo. 337; Deering v. Hannah, 93 Mo. App. 618; Brand v. Cannon, 118 Mo. 595; Rutledge v. Tarr, 95 Mo. App. 265; Rhodes v. Rhodes, 95 Mo. App. 327; Mitchell v. Mitchell, 191 Mo. 447. (3) There is no presumption of undue influence against a wife who is made the beneficiary in her husband's will, no matter how unequal a distribution of his estate he may make. The excluding of all his children or other relations raises no presumption against the wife. 1 Underhill on Wills, pp. 211, 212; Rankin v. Rankin, 61 Mo. 295; Mays v. Mays, 114 Mo. 536; Jackson v. Hardin, 83 Mo. 175; Defoe v. Defoe, 144 Mo. 458; Crowson v. Crowson, 172 Mo. 691; McFadin v. Catron, 138 Mo. 218; Meier v. Buchter, 197 Mo. 85; Kultz v. Jaeger, 29 App. D. C. 300; Wood v. Carpenter, 166 Mo. 465; Chadwell v. Reed, 198 Mo. 359. (4) Where, as in this case, a man of concededly sound mind makes his will, when in good health, there is no presumption of undue influence at all from mere inequality in the distribution of his estate. McFadin v. Catron, 138 Mo. 226; Berberet v. Berberet, 131 Mo. 399; Schierbaum v. Schemme, 157 Mo. 12; Hughes v. Rader, 183 Mo. 630. There is nothing in the case of Meier v. Buchter, 197 Mo. 68, relied upon by appellant, which denies or qualifies this well-established doctrine. (5) The burden of proof was on plaintiff to prove undue influence on the part of Mrs. Fulton in the execution of the will, and the evidence was wholly insufficient for that purpose. Every incident and circumstance proven or offered to be proven might well exist and still there be no such undue influence as the law deems sufficient to invalidate a man's will. 1 Underhill, Wills, p. 212;

Wood v. Carpenter, 166 Mo. 465; Defoe v. Defoe, 144 Mo. 458; Schierbaum v. Schemme, 157 Mo. 1; Tibbe v. Kemp, 154 Mo. 545; Doherty v. Gilmore, 136 Mo. 414-419; Hughes v. Rader, 183 Mo. 630; Sehr v. Lindeman, 153 Mo. 276; Crowson v. Crowson, 172 Mo. 691; Siebert v. Hatcher, 205 Mo. 104; Bauchens v. Davis, 229 Ill. 557; McFadin v. Catron, 138 Mo. 218; Ketchum v. Stearns, 8 Mo. App. 66, 76 Mo. 396; Herwick v. Langford, 108 Cal. 608; In re Donovan's Est., 140 Cal. 390. (6) The will of a deceased person will not be set aside on evidence which raises a mere suspicion or possibility of undue influence. Nor is evidence sufficient which shows that the circumstances attending the execution of the will are consistent with the hypothesis of its having been procured by such influence; it must be shown that they are inconsistent with a contrary hypothesis. Kultz v. Jaeger, 29 App. D. C. 300; McFadin v. Catron, 138 Mo. 219; Schierbaum v. Schemme, 157 Mo. 14; 29 Am. and Eng. Ency. Law (2 Ed.), 111; Kennedy v. Dickey, 100 Md. 152; Stewart v. Lyons, 54 W. Va. 665; Coughey v. Bridenburgh, 208 Pa. St. 414; Herwick v. Langford, 108 Cal. 608; Teckenbrock v. McLaughlin, 108 S. W. 46. (7) The theory, to which plaintiff's counsel has clung, throughout this long litigation, that Mr. Fulton, in 1880, was suffering from an insane delusion as to the conspiracy against his life, so as to invalidate his will, made nine years later, is in itself a "delusion." As heretofore pointed out, the evidence shows that the boat was fitted out by the persons charged, and that they were tried and convicted by a jury. It does not appear that the testator was in any error about the matter. But if he were, surely it was not an "insane delusion." "No belief that has any evidence for its basis is in law an insane delusion." Sayre v. Trustees, 192 Mo. 126; Stull v. Stull, 96 M. W. 202; 1 Underhill, Wills, pp. 126, 127; Owen v. Crumbaugh, 228 Ill. 380. Again, it is not pretended that this plaintiff was in any manner connected with that con-

spiracy, or that the testator's belief in it had anything to do with the making of his will in 1889. 1 Underhill on Wills, p. 125. (8) While a suit to contest a will is an action at law, this court will examine the evidence to see if there is any substantial evidence in the record to justify the setting aside of the will. Sayre v. Trustees, 192 Mo. 120; Archambault v. Blanchard, 198 Mo. 425; Teckenbrock v. McLaughlin, 108 S. W. 46; Jackson v. Hardin, 83 Mo. 185; Furber v. Bolt & Nut Co., 185 Mo. 311; Chadwell v. Reed, 198 Mo. 383. (9) As this case did not go to the jury, and the evidence, the exclusion of which is complained of, is set out in the record, this court can consider any legitimate evidence in the record, in determining whether the case should have been submitted. Southworth v. Southworth, 173 Mo. 74.

GRAVES, J.—Action by plaintiff, the son of William J. Fulton, deceased, contesting the will of deceased made in March, 1889. By said will it was provided (1) expenses of funeral to be paid out of personal property, (2) that executor sell so much of testator's property as may be required to pay debts and pay same, and (3) bequest of one dollar "and no more" to the plaintiff.

The remaining four paragraphs or items of this will read:

"Item 4th. I hereby devise and bequeath to my beloved wife, Elzie, all the residue of my estate, both real and personal.

"Item 5th. In case my said wife shall die before, or with me, I herein devise the residue of my estate to my stepdaughter, Lizzie McPike, in estate tail to her and the heir or heirs of her body forever.

"Item 6th. In case my stepdaughter dies without issue I devise the said residue of my estate, one-half to Pauline Engleman, of Parkville, Missouri, and one-half to Mary Scott, of Pueblo, Col.

"Item 7. I hereby appoint Joseph L. Freeland to execute this, my last will and testament."

Grounds of contest, as alleged, were (1) that said will was executed "by and through the fraud, deception, persuasion and undue influence of the defendant Elzie Fulton and Joseph L. Freeland, Lizzie McPike, and J. P. Tucker, or one or all of them, and of other persons related to said Elzie Fulton or friendly to her, and conspiring and conniving with her to procure said instrument, whose names are to this plaintiff unknown, and for that reason cannot be here stated;" (2) testamentary incapacity, thus stated: "That long prior to the signing and publishing of said instrument the mind of said William J. Fulton had become diseased and subject to a morbid delusion and hallucination amounting to a permanent and fixed insanity incapable of being removed and eradicated from the mind of said testator, which said delusion was in substance that the plaintiff herein and said testator's divorced wife had entered into a conspiracy for the purpose of inflicting bodily injuries upon said testator, and to wreck said testator financially; that said delusion was without reason and unfounded in any fact or substance whatever, but purely a delusion and insane conception of said testator induced, created and perpetuated fraudulently and wrongfully by the defendant Elzie Fulton and her friends until his death, February 9, 1902, for the purpose and with the intention of procuring from said testator the will sought in this proceeding to be vacated and annulled;" and (3) a general charge (in which is pleaded the alleged evidence) of a fraudulent scheme upon the part of Elzie Fulton, then Elzie McPike, a widow, beginning in 1876, when testator was married to another woman, by which the said Elzie by illicit relations with deceased sought to gain undue influence over him, separate him and his wife, and then marry him, and procure the will in question securing to her and her relations the property and es-

tate of deceased, which alleged fraudulent scheme it is charged was carried out by the said Elzie and others.

By answer the defendants admitted the execution and probate of the will, the death of testator February 9, 1902, the qualification of defendant Freeland as executor, and denied all other allegations. Further answering they averred that William J. Fulton was a citizen of Platte county when said will was made and published, over the age of twenty-one years and of sound mind, and that the said will, a copy of which was attached to the answer, was the last will and testament of William J. Fulton, and prayed that the same might be so declared.

Reply, general denial of the new matter in the answer.

As above stated, plaintiff is a son of deceased by a first wife. Defendant, Elzie Fulton, is the second wife and widow of deceased. Lizzie McPike is the daughter of Elzie Fulton by her first husband, William McPike, and Pauline Engleman and Mary Scott are sisters of Elzie Fulton.

The history of this cause as depicted by the versatile pen of plaintiff's learned counsel lacks only stage settings for a modern play. More or less of it will be required for a proper understanding of the points in dispute, and especially on the point made that the trial court erred in excluding certain testimony offered. The suit was brought in Platte county, but on change of venue was tried in Holt county.

In 1852, William J. Fulton was married at Adrain, New York, to Mary J. Hadley, then a girl of fourteen years and an orphan. The young wife had inherited seventeen acres of land and some money from her father. The young couple remained there, on this place, until 1863, when they removed to Wyandotte, Kansas. Prior to this removal the plaintiff in this case was born of this marriage. In 1876, the Fultons removed to Parkville. Upon reaching the West, Wil-

liam J. Fulton began contracting with a railroad company to furnish ties, timber and wood, and though he and his wife, Mary, suffered the hardships of tie camps, there was amassed considerable property. Troubles began shortly after the removal to Parkville. Two miles south of Parkville and in the neighborhood wherein William J. Fulton had large interests and was working many men, lived the widow McPike, on what is known as the Roberts farm, the old homestead of Mr. Roberts, father of Mrs. McPike, and the home of Mrs. McPike before her marriage to William McPike. Fulton acquired an interest in this farm and he and Mrs. McPike farmed it together. Mr. Fulton at that time was a business man of large affairs, and it is claimed by the plaintiff that Mrs. McPike at this time conceived the idea of separating Fulton and his wife, Mary, and ultimately marrying Fulton, and then procuring a will of the character of the one finally made, and to this end she used all the wiles of a crafty widow even to the extent of maintaining illicit relations with Fulton. The evidence at the trial was largely by deposition, and a great mass of it pertained to alleged proof of the relations between Fulton and Mrs. McPike from 1876 up to their marriage in 1881. This proof came largely from former employees of Fulton, both colored and white, from employees of Mrs. McPike, and from parties who testified to neighborhood rumors. The testimony of this character was excluded by the court and of this action error is assigned here.

Another contention of plaintiff is that through the influence of Mrs. McPike, Fulton was led to believe that a conspiracy had been formed by and between his then wife, Mary, and her nephew, William Hadley, and others to kill Fulton and get his property. That Fulton believed there was such a conspiracy is amply shown by his acts and the testimony of his neighbors and friends, but as to Mrs. McPike's connection therewith the tendered evidence is not convinc-

ing.   To the evidence bearing upon this alleged conspiracy we will advert later.

Following the thread of events it appears that on September 3, 1880, William J. Fulton sued his wife, Mary J. Fulton, for divorce.   In his petition he charged that they had not lived together as man and wife since the year 1870, although they both lived in the same house and he supported her.   That he first suspected his wife of infidelity to him in 1868, and from that time until the filing of the petition she had been guilty of adultery with divers persons upon divers occasions, some of which persons and dates were named.   That she used profane language toward plaintiff and in the winter of 1879-80 attempted to kill him with a pistol.   There was also the following charge:

"That in the spring of 1880, she and William O. Hadley and divers other persons, formed a conspiracy to murder the plaintiff and get possession of his property, and would have succeeded in all probability, but for the accidental and timely discovery of their hellish plot."

To this petition, Mary J. filed an answer and cross-bill.   In the cross-bill she complains of inhuman treatment at the hands of defendant from almost the date of their marriage.   That he compelled her, when fourteen and a half years of age, to do all house work for himself, his father, two sisters, brother and brother-in law, and to cut all necessary fire wood.   That he had, from that time on throughout their married life, been guilty of every kind of tyrannical action so as to make her life unbearable and unendurable; that she was sick and suffering and he neglected and abandoned her and gave her no care, devotion or affection; that whilst living in the same house with him in Wyandotte, Kansas, and Parkville, Missouri, she was wholly neglected and cruelly treated by plaintiff; that during such time he refused, neglected and failed to pay any personal attention to plaintiff and failed and refused to procure

necessary nurses, physicians, and medicine for her; that "he has uniformly during all these years been cold, unaffectionate, bitter, distrustful, suspicious, ungenerous, revengeful and brutal in his treatment of this defendant."

The cross-bill then proceeds to charge that he maliciously caused her to be arrested and imprisoned upon the charge of a conspiracy to murder him, and that the same was done to illegally assist him in this, his proceeding for divorce. The cross-bill also charges William J. Fulton with having been guilty of adultery with a number of women, naming them, and among them were Elzie McPike and Josie Fulton, the wife of his son, and M. Augusta Hadley, the wife of Mary J.'s brother.

March 31, 1881, the following decree was entered in that case:

"This day the above entitled cause coming on for final hearing upon the petition of plaintiff, the answer and cross-bill of defendant and plaintiff's reply thereto; and the court having heard all the evidence and arguments of counsel on both sides, finds that the plaintiff has by the proof sustained the charges of adultery specified in his petition against the defendant, and that the plaintiff is the innocent and injured party; the court, therefore, orders, adjudges and decrees that he be and is hereby divorced from the defendant; and, it not being necessary to pass upon the charge of conspiracy charged in plaintiff's petition, no finding is made upon that issue.

"The court further finds that none of the charges contained in defendant's cross-bill are sustained by the proof, and said cross-bill is dismissed. It is adjudged and ordered that the plaintiff pay the costs of this suit."

It appears that prior to August 20, 1880, Mary J. Fulton had been East with her relatives and friends and when she came back was arrested with her nephew,

William Hadley, upon the charge of conspiracy to murder William J. Fulton. Fulton made affidavit to such charge before David Mitchell, J. P., August 20, 1880. State warrant was issued on same day and William O. Hadley was apprehended on August 30, and Mary J. Fulton on September 1, following the issuance of the warrant.

All the foregoing records were introduced by the plaintiff in the present suit. The defendants then introduced record evidence showing that a change of venue was taken from Justice David Mitchell and the cause transferred to Justice Adam Woods, where upon a trial had the defendants were found guilty and punished by a fine of $200 and six months in the county jail. From this an appeal appears to have been taken, and the plaintiff in the case at bar introduced a record entry of the circuit court of Platte county of date April 1, 1881, showing that there was a *nolle pros.* entered by the prosecuting attorney. On November 2, 1881, William J. Fulton was married to Elzie McPike, and lived with her thence forward to the day of his death.

Returning to the question of conspiracy, the plaintiff, upon the first trial of this case, introduced as a witness John Fulton, a brother of William J. Fulton. At the trial from which this appeal arises John Fulton was dead, but the stenographer's notes of his previous evidence were read to the court and jury in this case. In substance, this testimony is that William J. wrote to him in the East about his troubles and the fears he entertained as to foul play upon the part of his wife, Mary J., and her relatives, the Hadleys, and asked him to investigate what was being done. This witness made an examination and in his testimony in chief said that there was nothing in the conspiracy. He admitted that he had written to William J. several letters, and was at a little station waiting to go home when a train from the West came in and to his surprise William J. got off. That he stayed with William J. several days

and nights and tried to explain to him that there was nothing in his suspicions. He admitted that he was not on friendly terms with his brother after 1882. He came out and worked for his brother from 1880 to 1882. Being pressed on cross-examination he admitted sending to his brother, prior to the unexpected visit of William J. in the East, the following letter, with which was enclosed a letter from C. B. Strong:

Osterhout, August 16th, 1880.

My Dear Brother:

Inclosed find a letter from my man at Tidaout. I received a letter from M. R. M. to-day. He tells me that Mary left Hornellsville the 12th, one day later than she expected. So that you will see that Will H. must have left the 11th. They were probably both to leave together and I presume that they are both in Kansas City now. Morg. tells me in a letter received from him, that Polly is writing Mary's history in full since she has been in Adrain, to send to you. As soon as I hear from Strong again I will let you know. The lady he speaks of is Mary. I expected she would stop there, as I wrote him to that effect. All I can say is, "don't be caught asleep, nor get faint-hearted."

Your ever true brother,

JOHN FULTON.

Tidaout, August 13th, 1880.

Mr. J. Fulton,

Dear Sir: Your letter of the 11th inst. to hand. The lady in question had not got here. He has given up going with the boat and his brother have taken the machinery out of it. Mr. Hadley left here two days ago. Which way I could not say, and I can't find anybody that knows. He may be going out of town for a few days, if so, I will let you know when he returns. But I think he has gone for good, as he has been making great calculations on going West with that boat and that failed him, so he had nothing to stay here for.

Yours truly,

C. B. STRONG.

Being further pressed, after having seen the letter, he admitted that upon receiving his brother's letter of date July 5, he had written to Strong to keep a watch on Mrs. Mary J. Fulton and the Hadleys, as he lived in their neighborhood. He admitted that M. R. M. mentioned in his letter was M. R. Miller, a brother-in-law of his; that Will H. was William Hadley who was afterwards tried and convicted at Barry in Platte county for a conspiracy to murder William J.

Fulton. That the Mary referred to was Fulton's wife, and that the Polly referred to was Polly Hadley, wife of Henry Hadley, a brother of Mary J. Fulton. John Fulton came out West and advised with William J., and later, within two weeks, at the request of William J. went back to his home in the East, sold out and came out to live in Platte county. He was also to further investigate upon his return East. He said that in the East upon this visit William J. was nervous and fearful of trouble from his wife and the Hadleys and continued so to be until they severed friendly relations in 1882. They seem to have fallen out because William J. would not indicate what John was to get for his work, as we gather it from the evidence, and we further gather that the witness was hostile to the second wife of William J. or at least had no use for her.

In the admitted evidence the foregoing is all there is to explain the idea that William J. entertained about there being a boat constructed in the East to come West for the purpose of carrying out a conspiracy. What was contained in the other letters from John is only apparent by inference.

In the excluded deposition of Mrs. Susannah Spencer is found the fact that the Mrs. Hadley mentioned in the letters, supra, wrote a letter to William J. Fulton, which he showed to the witness, and in this the alleged details of the plot were given. The witness says that William J. was nervous and pale when he showed her the letter. It also appears that this Mrs. Hadley came West and was here at the divorce trial. This evidence was offered by plaintiff and excluded as aforesaid.

There is some evidence as to Fulton's mental condition in 1880 about the time of this conspiracy matter. A fair sample of this evidence is that of the witness Frederick Kahn, who testified that Mr. Fulton thought

there was a conspiracy to kill him. Going to the point
in question, the language of the witness is:

"Q. From your own knowledge and acquaintance
with Mr. Fulton and your talks with him about this
conspiracy, and the circumstances surrounding that
entire transaction, I will ask you whether you consider-
ed Mr. Fulton's mind exactly right on that subject? A.
Well, I really don't know; if I were to judge myself,
I would say that he was not right on that subject—he
had his mind concentrated on that one point. . .
Fulton, I thought was a very successful business man.
I knew him in 1889, he was a strong-minded, intelligent
man at that time. Have had talks and business deal-
ings with him before and after 1889. My opinion is
formed from these transactions.

"Q. Now, I understood you, Mr. Kahn, that Mr.
Fulton was just as sane on this conspiracy question as
you are on any subject on which you firmly fix up your
mind, is that correct? A. Well, I couldn't say as to
that whether his mind was all right on that or not.

"Q. You don't say that it wasn't, do you? A.
Well, I don't know that I can.

"Q. And you testified, I believe, that a great
many people in this community also believed like Mr.
Fulton—that a conspiracy to kill him did exist? A.
Yes, he believed it, and the people believed it.

"Q. And a man by the name of Hadley—who was
connected with this conspiracy — was seen loitering
mysteriously around Parkville. A. There was a man
here by the name of Hadley around Parkville, a good
deal, they never called him Captain Arlington.

"Q. If Jim's name was connected in any way
with that conspiracy you never heard of it? A. I
don't remember of it being.

"Q. If Jim was connected with it you didn't hear
it from Mr. Fulton or any body else? A. No."

Of this class of testimony this is as strong as any
appearing in the record for the plaintiff. That is to

say, it goes as far as any to show a mental trouble in 1880 or 1881.

Plaintiff's evidence further tended to prove that his father was friendly towards him after his second marriage, although the wife was not; that they met at different places and talked; that his father helped him some financially; that the second wife said Jim could not have anything, if she could help it; that on several occasions she objected to his father talking to plaintiff; that Elzie Fulton was a high-strung woman and disposed to have her own way, and in some instances had gotten the husband to change his purpose, but the great bulk of plaintiff's testimony shows that, whilst the wife ran the house, Mr. Fulton ran his business affairs; that the home relations were not pleasant after the second marriage; that Mr. Fulton was a kindly, forgiving man and would yield a point rather than have trouble; that Lizzie McPike often vexed him.

The printed abstract contains three hundred and seventy pages of the evidence, much of which has been condensed, and in places it appears that some portions of a witness's testimony have been left out entirely.

Going to the date of the execution of the will in 1889, all the witnesses both for plaintiff and defendant say that deceased was a man of large business affairs; that he owned and managed large farms, sawmills, banks, and for three terms was mayor of Parkville. They all practically agree that he was a man of kindly disposition and would yield a point rather than have trouble with an employee or others. They practically all agree that he was in sound health, both physically and mentally, in 1889. There is some evidence that even in after years he spoke of this conspiracy to kill him, and clung to the belief that it was true.

Besides showing on cross-examination of the plaintiff's witnesses (as in the instance of Kahn), the defendant, by a mass of testimony coming from citizens of high standing and many of them of Statewide repu-

tation, showed the sound mental condition of deceased in 1889, and for years before and thereafter. So far as the record shows the beneficiaries did not know of the will for some time after its execution.

Further for the defendant, it is shown that Fulton at times mentioned his will to others and expressed satisfaction as to its terms. It appears that he at first thought of making Park College a beneficiary in the event of his wife's death and his step-daughter's death, and so informed the scrivener, who penciled a will to that effect, but several months later he requested Mr. McRuer, the scrivener, to call at his house and complete his will, and then told him that Mrs. Engleman had been as a sister to him, and told him to make her and Mrs. Scott beneficiaries in the event of the death of the wife and step-daughter. In each draft of the will the portion to plaintiff was the same. To the scrivener he said that James, the plaintiff, had been unfaithful to him, and in a way the record so speaks. From one or more witnesses it appears that at the time of the divorce proceedings James had threatened that they would pursue him until they broke him up. From much in the record the conduct of James was humiliating to his father. He was unable to get him to attend school. James persisted in acting as a kind of fakir at picnics and public gatherings. He espoused the cause of his mother at the divorce proceeding (a commendable act, generally speaking), but one which might afford the father ample reason to make other disposition of his property. He shot a negro at Parkville and occasioned the old gentleman much anxiety and expense. After the second marriage of his father, he and his mother lingered around the house after dark, much to the discomfort of the father. A subsequent lawsuit by the first wife followed over some property, and James again espoused her cause. Whether true or not, the father believed that James at one time in Kansas

City, about the date of this lawsuit, attempted to shoot him. Several years later, Mr. Fulton's bank at Parkville was robbed and the evidence of the cashier and others is that Mr. Fulton thought that James was a party to that robbery. He had written his father letters which were defamatory of the second wife.

From the evidence, no one was present when Mr. Fulton dictated the terms of his will, except the scrivener, McRuer. After it was written he took it up town the next morning or shortly thereafter, and meeting J. P. Tucker and L. A. Lathy on the sidewalk in front of Mr. Tucker's printing office, asked them to go upstairs to Tucker's office, and when there he signed the will and they attested it as witnesses thereto. No one was present except the three, unless some workman in the rear end of the newspaper office.

In general outline such is the case. At the close of all the evidence the court directed a verdict for defendants establishing the will. Such further reference to the evidence as may be required will be noted in the disposition of the points made.

I. An orderly method of disposing of the points raised by plaintiff on this appeal, is to take the question of the exclusion of certain testimony first, and this we will do. It is urged that the court erred in excluding that great mass of testimony tending to show illicit relations between deceased and Mrs. McPike from 1876 up to the date of their marriage. Was there error here? We think not. The divorce of the deceased from the first wife was in April, 1881, the marriage to the second wife in October, 1881, and the will was drawn in March, 1889. These occurrences are too remote.

In 1 Underhill on Wills, p. 213, it is said: "Evidence of illicit relations existing between the parties before their intermarriage, particularly if either of the parties were married at the time, is always relevant, though never controlling or conclusive of undue in-

fluence. But evidence of the illicit relations of the parties before marriage must not be too remote, or it will be rejected.''

To a like effect in Gardner on Wills, p. 203, it is said: ''Evidence is frequently inadmissible by reason of remoteness, such as the relations between testator and his wife eight or nine years before the will was made, or an estrangement between the testator and his wife, caused by the proponent, sixteen years prior to the making of the will, or a camping trip made by the testator and proponent nine years previous to the execution of the will, during which testator introduced proponent as his wife, though he had a wife then living.''

The same question has been up in this State in the case of Ketchum v. Stearns, 8 Mo. App. l. c. 69. In that case, which in facts is very much like this case, it is said:

''The plaintiffs sought to raise a presumption of undue influence affecting the execution of the will, by proofs of the relations existing between the testator and his second wife before their marriage, which was about eleven years before the making of the will; by testimony showing the dependent condition of the disinherited children; by showing that the testator had had difficulties with his first wife, and had separated from her, and that some of the disinherited children had taken sides with their father in those controversies; by showing that the relations between the testator and his disinherited children were friendly and affectionate about the time of the making of the will; by showing that some of the first wife's children had assisted the testator in accumulating property; and by proving some conversation of the testator, in the same year in which the will was made, concerning his intended disposition

of his property. There was also an offer to prove that one of the testator's daughters by his first wife had been obliged to leave her father's house, by reason of his second wife's request or influence to that effect. All the offers of testimony upon these matters were, upon defendants' objections, refused by the court, and these refusals are assigned for error.

"We can discover no ground of admissibility for any of this proposed testimony. The plaintiffs have undertaken to prove that the paper purporting to be the last will and testament of their ancestor was the product of an undue influence exercised upon him by Sarah M. Ketchum. 'Undue influence is that which compels a testator to do that which is against his will, through fear, through the desire of peace, or some coercive power which he is unable to resist, and but for the exercise of which the will would not have been made as it was.' [Pierce v. Pierce, 3 Cent. L. J. 226.] The testator was married to his second wife in 1855. His will was executed in 1866, and he died in 1877. Here is a period of more than twenty years, at some time during which these incidents of remote bearing, or none at all, are supposed to have indicated that the testator, in the hour when his will was written and signed, was acting under the coercive power above described, and that this coercive power was in fact held over him by Sarah M. Ketchum. Cause and effect are here far too widely separated for the purposes of fair investigation. All or any of the facts tendered might or might not coexist with a total absence of any such undue influence. They prove, or tend to prove, upon the question at issue, absolutely nothing. Their only effect, if introduced in evidence, might be, in the hands of ingenious counsel, to play upon the passions or prejudices of a jury, and give them an apparent excuse for thwarting the unkind discrimination of a father against some of his children.''

The Ketchum case, supra, came to this court and the conclusion reached by the St. Louis Court of Appeals was approved. [76 Mo. 396.]

In Pierce v. Pierce, 38 Mich. l. c. 419, Judge CAMPBELL says: "We think there is very little testimony in the record on this subject which should have been admitted at all. The domestic scandals of many years ago could have no legitimate tendency to prove any modern state of things, and could only serve to burden the case with irrelevant and discreditable details that might and evidently did prejudice the jury, but which had no tendency whatever to show influence in 1871. The law does not confine the power of making wills to persons of blameless character, nor does it disqualify all others from being legatees. And whatever may have been the relations of the testator and his second wife eighteen or nineteen years before his death, and whatever may have been the circumstances of their marriage, it cannot be permissible to draw inferences from them concerning a condition of things many years thereafter, which if existing at all could be proved without difficulty as an existing fact and not a possible contingency."

In a California case, In re Flint, 100 Cal. l. c. 398, wherein the will was executed nine years after the *meretricious* acts, the court said: "Conceding indiscretions to have been committed by these parties at this time, such evidence wholly failed to show any undue influence at a time many years after, for in the interim the parties were married, and she had been a lawful wife for years. The foregoing views are fully supported in Webber v. Sullivan, 58 Iowa 260; Batchelder v. Batchelder, 139 Mass. 1; Pierce v. Pierce, 38 Mich. 418."

To a like effect is the opinion of the Supreme Court of Colorado in the case of In Re Shell's Estate, 28 Colo. l. c. 170. In that case the illicit relations were in 1874 and 1875, the second marriage in 1880, and the

will made in 1891. The court said: "The attempt was made to show that, while testator was living with his first wife, the proponent entered the family circle, and, as a result of her machinations, an estrangement took place between the husband and the first wife which afterwards led to the divorce and later to the marriage of proponent and testator. As near as we can ascertain from the meager abstract, the time to which this occurrence relates was about the year 1874 or 1875, and it would seem that the second marriage took place in 1880, or perhaps later. While it is unwise to lay down any hard and fast rule respecting the time to which this class of testimony must relate, we are of opinion that, under the facts of this case, these circumstances were entirely too remote to be brought within the category of evidence tending to establish undue influence."

And so too in Batchelder v. Batchelder, 139 Mass. l. c. 2, that court thus states the rule: "The testimony offered to show what the relations between the testator and his wife were eight or nine years before the will was made relates to a period so remote that the court could properly exclude it."

We are of opinion that this evidence was too remote to be of probative force in this cause. Another question pertaining to this class of testimony will be discussed under the question of undue influence.

II. We will take the question of mental incapacity next, although the statement of facts leaves but little room for discussion. The only thing which is urged under the proof is that the testator in 1880, nine years prior to the execution of the will, had an insane delusion that he was to be injured by his first wife and her relatives and further that he entertained a delusion as to the attitude of the plaintiff toward him. No pretence is made that testator was not of sound and disposing mind at the execution of the will in question

save and except these alleged delusions. Testator was in the prime of life and in active business pursuits. His business interests were varied, and his management thereof successful. His business judgment was good, as practically all the witnesses testify. He had vigor of will power, although mild in disposition and disposed to get along smoothly with his fellowman. He was about 50 years of age and in good health.

Now, as to these alleged delusions. There is no such thing as a delusion founded upon facts. It is a mental conception in the absence of facts. If the idea entertained has for a basis anything substantial it is not a delusion. There may be a misjudgment of facts or there may be an accentuated opinion founded upon insufficient facts, but not a delusion, rising to the dignity of a mental aberration. As to the conspiracy of his former wife and her relatives and friends forming a plot in the East to do him bodily injury, it cannot be said that this was a delusion in face of the facts. His brother had written him sufficient facts to remove his views from the realm of delusions. In addition his brother had written him that Mrs. Bradley was writing the history of his wife at Adrain, New York, which she would mail him. He did get such letter and grew nervous and turned pallid as he handed it to the servant to read. He had them arrested and upon trial before a jury they were convicted. Upon appeal being taken it is true the case was dismissed by the prosecuting officer, but the officer testified in this case, and says that it was dismissed without the consent of deceased and that deceased was angry when he found that the case had been dismissed. The prosecuting attorney, explaining his action, said that there were one hundred and fifty witnesses in the case from Parkville, most of whom were favorable to the views entertained by testator, but that he concluded that inasmuch as Hadley, one of the defendants, had already been confined in jail for six months, he had been sufficiently punished,

and that it was of doubtful propriety to try to convict the woman, and he therefore of his own motion dismissed the case. So that there was sufficient in substance to eliminate the question of a delusion. In fact, plaintiff's witness, Kahn, said that not only did deceased believe the matter to be true but the people generally in Parkville so believed, so that if testator was suffering from a delusion, many of the citizens of Parkville were likewise suffering. Nor were the views he entertained as to the hostile attitude of the son wholly imaginary as the statement of facts shows.

The rule as to what constitutes an insane delusion is thus expressed by 1 Underhill on Wills, sec. 94, p. 126: ''Thus the fact that the testator believed that his relatives have ill-treated him, or that they are inimical to him and have conspired to defraud him, and for that reason leaves his property to strangers, does not constitute an insane delusion, unless it appears that his belief was wholly without any basis whatever, and th t the testator obstinately persisted in it against all argument which may have been employed to dissuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves his belief may seem illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has not reasoned correctly.''

See also Stull v. Stull (Neb.), 96 N. W. l. c. 202; Bauchens v. Davis, 229 Ill. l. c. 561; Scott v. Scott, 212 Ill. 597.

In the Stull case, supra, the court says: ''No belief that has any evidence for its basis, is in law an insane delusion.''

In Sayre v. Trustees of Princeton University, 192 Mo. l. c. 126, this court quotes with approval the above language from the Stull case.

In the case of Scott v. Scott, supra, it is said: "An insane delusion is a belief in something impossible in the nature of things or impossible under the circumstance surrounding the afflicted individual, and which refuses to yield either to evidence or reason." This language was quoted and approved in the later case of Bauchens v. Davis, 229 Ill. l. c. 561, which case has some features similar to the case at bar. In the Bauchens case the children had sided with their mother in a divorce suit, after which the father entertained the idea that they were against him and willed practically all his property to a stranger. The will was upheld and his idea as to his children were held not insane delusions because founded upon facts.

Under the facts in this case there was no sufficient evidence to establish an insane delusion, and with this eliminated there is absolutely nothing upon which to submit the issue of mental incapacity to the jury. The peremptory instruction in so far as this branch of the case was concerned was properly given.

III. (a) Going then to the question of undue influence, how stands the case? No attempt is made to show undue influence upon the part of any of the beneficiaries, save and except the wife. The fact that the wife is the chief beneficiary in the husband's will raises no presumption of undue influence. The law is concisely stated by Mr. Underhill thus: "The fact that a man bequeaths his estate to his wife, excluding his children, his father or other relations, is absolutely immaterial upon the question of undue influence. The silent influence of affection and respect, augmented by the tender and kindly attentions of a faithful spouse, cannot be regarded as in any sense undue. Nor will the fact the wife by solicitation, or even by urgent importunity, procures for herself all her husband's property, or a larger share than he devises to others, raise a presumption of law that the husband's will was pro-

cured by undue influence exerted by her, or that his mind did not act freely in preparing it. . . . It will not be presumed, because a wife has ample opportunity to exert an influence which may be undue, that she has in fact done so. Nor will any presumption of undue influence arise from the fact that the wife advised her husband in his business affairs and guided him through many difficulties, and at one time advised or requested him to make a will in her favor.'' [1 Underhill on Wills, sec. 147.] Our court has long followed this rule. [Rankin v. Rankin, 61 Mo. 295; McFadin v. Catron, 138 Mo. l. c. 219; Myers v. Hauger, 98 Mo. l. c. 439; Jackson v. Hardin, 83 Mo. l. c. 185; Mays v. Mays, 114 Mo. l. c. 540.] Of course, if the husband was of weak mental capacity and the wife transcended the limit of the rule and attempted to foist upon a weak and diseased mind a will of her own dictation, then a different question would be presented. But such is not this case. There is some feeling shown to have existed between the wife and the plaintiff herein, but in the evidence there is foundation for it. It is not shown that she ever mentioned the making of a will to the husband but on the contrary it is shown that she did not know of it for sometime afterwards. Under all the evidence the will was dictated by the testator. The wife was not present when it was executed. For years the husband kept this will, with ample opportunity and mental capacity to change it, but did not. On the other hand he talked of it and was satisfied with its terms. The attempt to show undue influence in the procuration of this will fell far short of the quantum of evidence required of one who has this burden in a contest of a will.

(b)   Referring again to the excluded evidence, and conceding its admissibility, still there would be no case for the plaintiff. The evidence is all in the record by way of depositions and if we held it relevant and proper, we could consider it as admitted and pass upon

the case upon its merits without retrial.  The only purpose of this evidence is to show undue influence, and wherever such evidence has been admitted the courts have always held that it must be followed by acts of undue influence after the marriage.  Such was not shown here.  Counsel for plaintiff overlooks the definition of undue influence as that term is applied to a wife.

.The weight of authority seems to be to the effect that even where a person of sound and disposing mind makes a will in favor of a mistress or to one with whom his relations have been meretricious, yet there is no presumption of undue influence.  In the notes to the case of In Re Hess's Will, 31 Am. St. Rep. 1. c. 677, the learned annotator, after reviewing the cases, says: "As long as the absolute power of testamentary disposition is conceded, and the owner of property is allowed to dispose of it to whomsoever he pleases, and for such reasons as to him shall seem adequate, his right to make a bequest to one with whom his relations have been meretricious must be. admitted, even though it be further conceded that the bequest was made. because of these relations.  Nor can the existence of those relations create a presumption of undue influence, and impose upon the beneficiary the burden of disproving the exercise of such influence."

In the very recent case of Weston v. Hanson, 212 Mo. 273, a case where after a divorce from his wife in the trial of which the children took the part of the mother, the testator made a will to his mistress, this court, after reviewing the case, said:

"These cases are all answered by the evidence in the case at bar, which does not show that the defendant was present at the time of the execution of the will. Nor does it show that she ever knew that it was about to be executed, or that she had any conversation with the testator in regard to it before its execution; but it does show that  the testator was a man of intelli-

gence, a shrewd business man, who had occupied prominent positions, and that he was a man of fine physique and of strong will power; that he went alone to his attorney and employed him to prepare his will, gave him full and explicit directions as to how he wished to dispose of his property, also the names and places of residence of each of his children, and was at that time in possession of all his mental faculties; and it is only in the absence of some one or more of these conditions that the authorities which we have referred to, except Dean v. Negley, 41 Pa. St. 312, and McClure v. McClure, 86 Tenn. 173, have held that a presumption of undue influence arises from meretricious relations existing between the donor and the donee. Dean's case has been overruled, or its holding modified, by subsequent cases in the same court, and this court and the St. Louis Court of Appeals declined to follow it. [Sunderland v. Hood, 13 Mo. App. 232.] Besides, such an inference should not be drawn from the evidence relating to the relations which existed between the testator and the devisee in the case at bar, in the absence of proof that Mary Hanson 'exerted her influence in the procuration of the will.' [Arnault v. Arnault, 52 N. J. Eq. 801; Dickie v. Carter, 42 Ill. 376].

"The presumption is in favor of the theory that the will expresses the purpose and intention of the testator. 'Without proof that a mistress influenced a testator directly in procuring a will in her favor, it cannot be inferred from their relations that she secured an influence over him which she would naturally and improperly exert to advance her interest.' [Middleton's Case, 68 N. J. Eq. 584; Monroe v. Barclay, 17 Ohio St. 317; Matter of Mondorf, 110 N. Y. 456.] The law as announced in Middleton's case, supra, is, as we understand it, the law of this State as declared in Sunderland v. Hood, 13 Mo. App. 232, and Sunderland v. Hood, 84 Mo. 293, and to which we adhere."

In the case at bar the testator was fully as capable of making a will as was the testator in the Weston case, supra. There is also the absence of any direct influence in the procuration of this will, as was in the Weston case. So that even if all this mass of testimony covering the period of from 1876 to 1881 had been admitted, without something more, it would have been insufficient to authorize the submission of the case to a jury. The court should never permit a case to go to a jury if such court is satisfied that under all the evidence a verdict for the plaintiff should not be permitted to stand. We are cited by counsel to the recent case of Mowry v. Norman, 204 Mo. 173, on the question that this cause should have been submitted to the jury. Counsel misjudge that case in undertaking to apply it here. In that case facts were in evidence which showed a fiduciary relation between testator and the chief beneficiary. Physical infirmities were shown, and we held that proof of the fiduciary relation raised a presumption of undue influence and it was for the jury to say whether this presumption had been overcome by the evidence of defendants. In the case at bar there is no presumption of undue influence, but on the other hand the burden was on plaintiff to show it. Failing to carry that burden his case must fail.

Full research of this voluminous record and of the questions presented leads us to the conclusion that the trial court committed no error in directing the verdict for defendants. The judgment is affirmed.

All concur, except *Woodson, J.,* not sitting.