GUST NOOK, Appellant, v. J. B. ZUCK et al.

Division One, July 11, 1921.

1. **WILL: Attestation: Recitals: Witness to Mark.** The statute requiring that "every will shall be in writing, signed by the testator, or by some person, by his direction, in his presence; and shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator" does not require that a statement of all these things shall appear on the face of the will, or that the word "attest" or that anything whatever shall be written thereon other than the name of the testator and the names of the witnesses. If the maker signed the will by making his mark, and three other competent persons signed it as "witness to mark," and testify that the mark was made before they signed it, and that he declared it to be his last will and they signed it at his request as witnesses and in his presence, it was sufficiently attested.

2. ———: **German Testator: Read to Him in English.** The testator could, with difficulty, speak a few words in English and make his wants known in making purchases, but could not write or read the English language, and said he could not talk it well enough to dictate his will in English; the scrivener could not understand German, but the testator told two witnesses who could understand both German and English just what different amounts of money he wished to give to each of his children and what land he wished to devise to a certain daughter, and those witnesses translated and repeated his requests to the scrivener in English, who wrote them down in English, and after the will was completed it was

Nook v. Zuck.

read to him in English, and he thereupon signed it and asked the witnesses to attest it, but one of them before he signed it talked with him and he told them the paper was his last will and testament and wanted them to sign it; and the evidence is clear that he comprehended the extent of his property and the disposition he wished to make of it, and the oral testimony is all to the effect that the instrument disposed of it as he desired. *Held*, that the instrument was his will and testament.

3. ———: **Undue Influence: Peremptory Instruction.** Where there is no evidence of coercion having been exercised at or prior to the time the will was executed, and the only approach to proof of undue influence is the testimony of parties in interest that the testator subsequently to the execution of the will cried and said they made him change his will, it is the duty of the court to direct a verdict for the proponents.

4. ———: **Testamentary Incapacity: Old Age: Paralysis.** Where the only evidence of testator's testamentary incapacity is that he was between eighty-five and eighty-six years of age, and had for sometime been paralyzed and unable to walk or use his hands, but his digestion and assimilation were good, and the paralysis had no tendency to affect his mind, there is no evidence of mental incapacity, and a peremptory instruction directing a verdict for proponents on that issue is proper.

Appeal from Atchison Circuit Court.—*Hon. John W. Dawson*, Judge.

AFFIRMED.

*R. F. Hickman* and *Hunt, Bailey & Hunt* for appellant.

(1) The will being in the handwriting of another, proof of the adoption by the testator must be clear. 40 Cyc. 1084; Plater v. Groome, 3 Md. 134. (2) The testator must know and understand the contents and meaning of the will. If it appears affirmatively that he did not read it, and that it was not read to him, it must be shown that the contents were in some way known to him. 40 Cyc. 1100-2, 1101-d. (3) A will executed in a language unknown to the testator is valid where it appears he knew the contents, but otherwise is void. 40

Cyc. 1101-e; Miltenberger v. Miltenberger, 78 Mo. 27; Bingaman v. Hannah, 270 Mo. 611, 629; Adams v. De-Cook, 23 How. (U. S.) 353; Carlson v. Largram, 250 Mo. 527 to 538. (4) It reversible error to give a peremptory instruction in the nature of a demurrer to the evidence, where there is any substantial evidence supporting plaintiff's case. 38 Cyc. 1548; Crum v. Crum, 231 Mo. 626; Bender v. Railroad, 137 Mo. 240, 244; Young v. Webb City, 150 Mo. 333, 341; Enloe v. Car & Foundry Co., 240 Mo. 443, 448; Carlson v. Lafgram, 250 Mo. 527, 537; Re McCabe, 134 N. Y. Supp. 682.

*Tinley, Mitchell, Pryor, Ross & Mitchell* and *James F. Gore* for respondents.

(1) Under the evidence in this case the court was justified in giving a peremptory instruction. Hahn v. Hammerstein, 270 Mo. 248, 198 S. W. 833; Southworth v. Southworth, 173 Mo. 59; Welsh v. Kirby, 255 Fed. 451, 9 A. L. R. 1409; Winn v. Grier, 217 Mo. 420; Sayre v. Princeton University, 192 Mo. 95; Crowson v. Crowson, 172 Mo. 691. (2) A will drawn in a language which is not familiar to the testator is good, provided it appears that the testator knew he was making a will, and that the disposition he desired to make of his property was correctly stated in the instrument purporting to be his will. In re Arneson's Will, 107 N. W. (Wis.) 21; In re Gillmor's Will, 117 Wis. 302, 94 N. W. 32; Rothrock v. Rothrock, 30 Pac. (Ore.) 453; Lyons v. Van Riper, 26 N. J. Eq. 339; Brown v. Brown, 3 Conn. 299; 1 Alexander on Wills, sec. 38, p. 41; In re Will of Walter, 25 N. W. (Wis.) 538; Hoshauer v. Hoshauer, 26 Pa. St. 404; Wombacher v. Barthelme, 62 N. E. (Ill.) 800; Gerbrich v. Freitag, 73 N. E. 338; In re Dobal's Estate, 176 Iowa, 479, 157 N. W. 169. (3) There is a presumption that he who signs a will knows its contents. Hoshauer v. Hoshauer, 26 Pa. St. 404; Ross v. Ross, 140 Iowa, 51; Keithley v. Stafford, 136 Ill. 507; In re Dobal's Will,

176 Iowa, 479, 157 N. W. 169.  (4)  The will was properly attested.  Sec. 537, R. S. 1909; Withinton v. Withinton, 7 Mo. 589; Murphy v. Murphy, 24 Mo. 526; Mays v. Mays, 114 Mo. 536; Berberet v. Berberet, 131 Mo. 399; Crowson v. Crowson, 172 Mo. 700; 40 Cyc. 1125; Borland on Wills, p. 36, sec. 41.

ELDER, J.—This is a suit to contest the will of Chris Nook, deceased, brought by appellant, a son of the testator.  Respondent J. B. Zuck is the administrator, with the will annexed, of the estate of said Chris Nook; respondent Lena Speigel, wife of Andrew Speigel, is the daughter of the deceased; respondents Georgie Mattis et al. are minor grandchildren of the deceased.

The will was dated Februpary 12, 1917, and was admitted to probate by the Probate Court of Atchison County on February 11, 1919.  The testator died August 31, 1918.

The charging part of the petition alleges that for several years before his death the testator had been "an invalid, infirm, feeble, childish and of unsound mind;" that he was a German and could not "understand, speak or write the English language; that one P. L. Van Meter, who drew said will for said Chris Nook, deceased, could not understand, speak or write the German language; that one Charles Winkler and George Winkler dictated said will to P. L. Van Meter, and he wrote the said will as they dictated it, and said Van Meter wrote it down as they dictated it, not knowing whether or not they were giving a true and correct version of said will.  It was read over to Chris Nook in English, and he could not understand the English language; and plaintiff alleges that said pretended will is not nor does it bear or contain the true version of said will of said Chris Nook, deceased, and is not his will; . . .

"That at the time the said will was made, the said Chris Nook was not capable of making a will at all; and

whatever was done was and is a nullity and absolutely void, and that the said Lena Speigel and her husband, Andrew Speigel, secured said Chris Nook to make said will by fraud, and undue influence, which they praticed upon the said testator, and that the said Chris Nook was not of sound and disposing mind and memory.''

The answer of respondents Zuck admits that Chris Nook died leaving as his last will the instrument mentioned in the petition, admits the probate of the said will and the appointment of respondent as administrator, but denies all other allegations of the petition. The answer of respondents Speigel admits the relationship and heirship of the parties; admits the appointment of respondent Zuck as administrator; admits the probate of the will, and that deceased died. at the home of respondents Speigel, where he had resided before his death; alleges that the instrument described in the petition is the ''valid last will and testament of the said Chris Nook,'' but denies all other allegations of the petition. The answer of the respondent minors, by their guardian *ad litem,* was a general denial.

The issues were duly submitted to a jury, and, at the close of the evidence adduced by both the proponents and contestant, the trial court gave a peremptory instruction in the nature of a demurrer to the evidence, as follows: ''The court instructs the jury that under the law and the evidence, your verdict. must be that the instrument offered in evidence, marked defendants' 'Exhibit A,' is the last will and testament of Chris Nook, deceased.'' Pursuant to such instruction the jury returned a verdict that the paper in evidence was the will of Chris Nook. From a judgment rendered on that verdict, contestant has appealed.

With certain additions thereto (to be considered in the course of the opinion), respondents have agreed to appellant's statement of the facts. We therefore adopt the same in part, as follows:

"At the time of the making of the will in question, the deceased, Chris Nook, was between the age of 85 and 86 years. He was very feeble and practically helpless; unable to walk or use his hands. This condition had existed for more than five years prior to the making of said will. His knowledge of the English language was exceedingly limited. He could speak a few words, such as 'yes' and 'no,' and could make a few of his wants known, with difficulty, in making purchases. He could not write or read the English language at all, and could not carry on a general conversation in that tongue. Owing to his inability to understand the English language he never employed hands to work for him who spoke English.

"On the 12th day of February, 1917, Charlie Winkler, George Winkler, J. W. Brown and P. L. Van Meter met at the home of the said Chris Nook, deceased, relative to the will in question. P. L. Van Meter acted as scrivener and the two Winkler boys acted as interpreters.

"George Winkler testified that he could not write the German language at all, but that he could translate German language into the English language and write in English; and that he could translate English into German.

"Charlie Winkler testified that he could talk High German, but he could not speak Low German at all, and that he understood it just a little; that he could not write German; that he could not readily translate from the German language into the English language. P. L. Van Meter could not write, read, speak or understand the German language. J. W. Brown could not speak or understand the German language.

"On the date aforesaid, February 12, 1917, when said parties went to the home of Chris Nook, deceased, relative to the will in question, the two Winkler boys spoke to the deceased in German concerning his will, and then translated said conversation to Mr. Van Meter in English, and Van Meter reduced said conversation to writing in English. After the completion of the purported

will said Van Meter read the same over to the deceased in the English language. Said will was never read to the deceased in the German language. After reading said will to the deceased, Van Meter asked him if that was the way he wanted everything, and deceased said, 'Yes.' Neither Van Meter nor Brown knew whether the Winkler brothers correctly translated the language of the deceased from the German language into English.

"Deceased was so badly paralyzed that he had to sign said purported will by making his mark thereto, Van Meter assisting him. The will was signed as follows:

" 'Witness to mark                          his
CHARLES WINKLER .                   CHRIS X NOOK
GEORGE WINKLER                              mark
J. W. BROWN

" 'Subscribed and sworn to by Chris Nook this 12th day of February, 1917, in the presence of each of the above witnesses.

" 'P. L. VAN METER.
" (Seal)    ·                              Notary Public.'

"The above acknowledgment, which is signed by the notary, was written on the purported will after the other parties signed the same as witnesses to the mark of the deceased.

"Deceased at the time of making the said will, and at the time of his death in August, 1918, lived in Atchison County, Missouri, near the Iowa line, a small portion of his land being in Fremont County, Iowa, and the remainder being in Atchison County, Missouri. The Winkler brothers above mentioned lived in Fremont County, Iowa, a short distance from the home of deceased, and were farmers by occupation. P. L. Van Meter lived in Hamburg, Fremont County, Iowa, and was a banker by occupation. J. W. Brown lived in Fremont County, Iowa, and was engaged in farming and lived a short distance from the home of deceased.

"Andrew Speigel, husband of Lena Speigel, notified George Winkler, Charles Winkler, J. W. Brown and P.

L. Van Meter that their presence was desired at the making of the will in question.

"The evidence disclosed that after the marriage of the children of the deceased, said children, with the exception of Lena, left the home of the deceased and set up homes for themselves. Lena Speigel and her husband, Andrew Speigel, lived at the home of the deceased from the time they were married up to the time of the death of deceased. They promised to keep deceased and his wife as long as they lived, and in return for such care deceased agreed to let them have the land rent free.

"Prior to the making of the will, February 12, 1917, deceased had a conversation with appellant with reference to a will he had made. On that occasion appellant came in the house and noted that deceased was crying very hard. Upon appellant asking him what was the matter he said, 'They made me change the will;' that Andrew Speigel and George Winkler had come down to make me change it. About two weeks before the death of the deceased, and after making the will in question, deceased had a conversation with Miss Minnie Nook, daughter of Gust Nook, appellant. Speaking with reference to the will in question deceased said to Minnie Nook, 'I was forced to make a will, they made me do it,' and cried like a child.

"During the last five years of his life deceased was practically under the sole care and control of his daughter, Lena Speigel, and her husband, Andrew Speigel; and was also under the care and control of his second wife up to the time of her death. During all these years the old man was a helpless invalid suffering from paralysis, dropsy and rheumatism; and he could only make his wants known in the German language. He frequently had crying spells, and spent the latter years of his life sitting in a chair, which caused severe dropsical swelling of his lower limbs."

Other facts necessary to a determination of the questions involved, will be adverted to in the course of the opinion.

The writing in contest, omitting signatures of the testator and witnesses and certificate of the notary public, which are set out in the statement of facts, supra, is as follows:

"I, Chris Nook, being of sound mind do make this my last will and testament, hereby revoking all former wills having been made by me.

"I hereby give and bequeath to Mrs. Lena Speigel all of my farm land with improvements on and known as my home farm consisting of 64 acres, 16 acres being in Iowa, Fremont Co., and the balance in Missouri, Atchison County.

"I further give to Mrs. Martha Mattis' heirs, $400 same to be paid by Lena Speigel on execution of this will.

"I also give to Herman Nook's heirs at law $400 same to be paid by Lena Speigel on execution of this will.

"I further give to the heirs of Robert Nook $800 same to be paid on execution of this will, by Lena Speigel same as above.

"I further give to Gust Nook $400 same to be paid by Lena Speigel on execution of this will.

"I also have $1000 cash out of which I want all funeral expenses paid first and the balance with such accrued interest as may be, divided equally between the five heirs named above.

"I also state further that in case any of my heirs contest this will that they are to lose their share of my estate as above divided."

I. Appellant contends that the trial court erred in admitting in evidence the will of the deceased for the reason that it was not properly attested.

The statute governing the attestation of wills, Section 537, Revised Statutes 1909 (Sec. 507, R. S. 1919), provides that "every will shall be in writing, signed by the testator, or by some person, by his direction, in his presence; and shall be attested by two or more com-

petent witnesses subscribing their names to the will in the presence of the testator." As said in Berberet v. Berberet, 131 Mo. l. c. 408, "The statute says the will shall be attested by two or more competent witnesses subscribing their names thereto. It does not say that the word attest shall be written on, or at the conclusion of, the will, or that there shall be written thereon anything whatever other than the names of the attesting witnesses." And as said by WOODSON, J., in the recent case of Welch v. Wagner, 232 S. W. 146, in commenting upon this section, "It will be observed that the statute only requires that the will shall be signed by the testator, or by some person at his direction, in his presence, and that it shall be signed by the witnesses in the presence of the testator. The statute nowhere requires the will to state upon its face that any or all of those things were done."

With respect to the circumstances attending his signing of the will as a witness, George Winkler testified: "Mr. Nook asked me to sign it, as a witness to his will. When I signed it I noticed that Mr. Chris Nook made his mark there at the time. That mark was made prior to the time that I signed it as a witness. J. W. Brown, my brother Charles, Mr. Nook and myself were all present. . . . I saw Charles Winkler and J. W. Brown sign their names there on defendants' 'Exhibit A,' and I saw Chris Nook make his mark there."

Charles Winkler testified: "I signed my name there to defendants' 'Exhibit A.' That is my signature. George Winkler, J. W. Brown and P. L. Van Meter and Chris Nook were present.

"Q. How did you come to write your name there and at whose request, if anybody's? A. Mr. Nook's.

"Q. And what for, what purpose? A. For a witness. .

"Q. To what? A. To the will. . . . I saw the other signatures made there by my brother and J. W.

289 Mo.—3

Brown.  Mr. Nook made his mark prior to the time I signed my name to the will.  . . .  Mr. Chris Nook asked me to sign as a witness.''

J. W. Brown testified:  ''That is my signature to defendants' 'Exhibit A.'  Before I signed I saw Mr. Nook make his mark; that mark was there when I signed my name.  After Mr. Van Meter read that over in English I asked Mr. Nook if that was his will and if that was the way he wanted it, and he said it was, before I signed it. , . . I signed at Mr. Nook's request.''

From the foregoing it is manifest that the statute was fully complied with.  Accordingly, and upon authority of the adjudicated cases, we must hold that the will was sufficiently attested.  [Berberet v. Berberet, supra; Mays v. Mays, 114 Mo. 536; Grimm v. Tittman, 113 Mo. 56; Schierbaum v. Schemme, 157 Mo. 1; Cravens v. Faulconer, 28 Mo. 19.]

II.  Appellant next urges that the court erred in holding that the instrument offered in evidence was the last will of Chris Nook, deceased.  In support of this insistence learned counsel for appellant argue that it appears affirmatively that Mr. Nook did not read the purported will; that it was not read to him in a language that he could understand; and that the proponents of the will did not show by any testimony that he knew the contents of the same after it was written.

*Directions Given in German: Will Written in English.*

As authority for the contention urged, counsel rely largely upon Miltenberger v. Miltenberger, 78 Mo. 27. An examination of that case, however, renders it readily distinguishable from the case at bar.  While the will in question was there written in a language which the alleged testatrix could not read, write or speak, it was attested by witnesses not at her request, but at the request of one of the legatees, and neither of the witnesses could testify to any declaration of the deceased, or any act on her part, except that of signing the paper, or any

declaration in her presence and hearing indicating that she knew the contents of the paper, or that she signed it as her last will. The evidence here is clear that the deceased knew that he was making a will, that he knew the disposition he desired to make of his property, and that he requested the attesting witnesses to sign the instrument as his will. Charles Winkler, one of the attesting witnesses, testified: "Before I signed we talked with him and he told us that this was his last will and testament, and that he wanted me to sign it. . . . I think he understood about his children and grandchildren, and his son and daughter that were living. He knew them. I think that he comprehended the extent of his property and the effect that his will would have upon it." J. W. Brown, another attesting witness, testified: "I asked him if that was his will, what he wanted done with his property, and he said it was. That was after Mr. Van Meter read this will. So I signed there." The cirsumstances surrounding the execution of the paper in question being so entirely dissimilar, the Miltenberger case, supra, cannot therefore be said to be controlling in the instant case.

With respect to the deceased's understanding of the contents of the instrument after it was written, a review of the evidence shows that he could speak, read and write the German language. George Winkler and Charles Winkler, who spoke both German and English, testified that at the time the will was written the deceased directed them in German that $400 be given to the heirs of Martha Mattis, $400 to Gust Nook, $400 to the heirs of Herman Nook, $800 to the heirs of Robert Nook, all to be paid by Lena Speigel; that Lena Speigel was to have the land, and that "after the funeral expenses and everything was paid" the $1000 in cash which Mr. Nook had was "to be divided equally between all of the heirs, those that had been mentioned." These directions, which the writing under review shows were embodied therein, were communicated in English by the Winklers to Mr. Van

Meter, the scrivener, who could not write or understand the German language. Mr. Van Meter testified: "I wrote down all of what I understood of what the Winkler boys told me, and when I didn't I asked them over, and they would ask him questions as they went along, in regard to the different portions. That continued through the entire writing of this instrument. . . . I read the will over to him and asked him if that was the way he wanted everything. I read the will in English. When I asked him the question he said, 'Yes.' I asked him if that was like he intended in every way. He said, 'Yes.' He nodded his head, but you couldn't go by that altogether because he was palsied, but he would understand."

As to deceased's understanding of the English language George Winkler testified: "He could understand and talk some English, quite a good deal. He said he couldn't talk well enough to dictate his will in English." Dr. E. E. Richards, who had visited the deceased professionally, and who could not speak German, testified:

"Q. Were you able to communicate with Mr. Nook at that time? A. Pretty good: not all that I wanted to ask him, but most of it. "Q. Did you have any particular trouble to get him to understand what you were asking him? A. No, I didn't; but I had a good deal of trouble understanding him."

J. W. Brown testified: "I don't know how well he could talk English, but he could talk well enough so he could make me understand anything he had to sell, or if he wanted to buy anything he could make me understand. If I had anything to buy or anything to sell he could understand me. . . . When they were making this will, he would dictate to them in German, and then they would translate it into English; I suppose they were translating it correctly. They seemed to be pretty honest people. I knowed them a long time, and I never knowed them to tell anything but the truth." Charles W. Davey, an implement dealer, testified: "I transacted business with Mr. Nook in English. I had

no general conversation with him, just buying and selling. He didn't always see what he wanted—he would ask for it; as I recollect it he would call it by the right name in English. He could count money in English."

In Wombacher v. Barthelme, 194 Ill. 425, 62 N. E. 800, where the testator, a German, had declared his purpose of making a will substantially as it was made, and his statements showed that it was framed in accordance with his intention and purposes, conflicting evidence as to his ability to read the English language, in which the will was written, was held insufficient to show that he did not know the contents of the will, so as to render it invalid.

In Gerbrich v. Freitag, 213 Ill. 552, 73 N. E. 338, where the makers of a joint will were Germans, but understood English, and where the scrivener read it to them in English, explaining it in German, it was held that the testators understood the contents of the will and executed it in accordance with the law.

In the proceeding, In re Arneson's Will, 128 Wis. 112, 107 N. W. 21, where a will written in the English language, which the testator did not understand, was translated to him before execution in Norwegian, which language he did understand, it was held valid, the court saying: "Of course in such a case it should appear clearly that the testator was otherwise accurately informed of the contents and meaning of the instrument in a language which he did understand, but that being established, as we consider to be the case here, there is more doubt of his purpose and intention in executing it than if his knowledge of the contents were derived from reading or hearing read a document written in a language which he did understand. How, otherwise, could parties who understood no common language become mutually bound to any written contract?" In Rothrock v. Rothrock, 30 Pac. (Ore.) 453, the will of a speechless paralytic, seventy-four years of age, whose mind was unimpaired, was held valid where his wishes

as to the disposition of his property were communicated by negative and affirmative replies to questions asked him, and, after it was written, it was read to him item by item, and his assent given by nods of his head.

In the proceeding. In re Estate of Dobals, 176 Iowa, 479, where the testatrix, who was a German, told the scrivener in English the disposition she desired to make of her property, and while the scrivener was writing she talked the provisions over in German with a banker who was her business adviser, and the banker told the scrivener in English what the testatrix had told him in German, which the scrivener testified was the same as what he had understood previously from her in English, it was held that the evidence was insufficient to justify submission to the jury of the question whether deceased would sufficiently understand the English language to understand the will and what she was doing at the time of its execution.

In Hoshauer v. Hoshauer, 26 Pa. St. 404, the rule is enunciated that when the execution of a will had been proved by the subscribing witnesses, although the witnesses did not hear it read to the testator, it is to be presumed that he was acquainted with its contents, notwithstanding the fact that he could neither read nor understand the language in which it was written.

An analysis of the evidence in the case under review shows that the testator Nook manifestly comprehended the nature of the transaction he was engaged in, knew the nature and extent of his property and to whom he desired to give it, and knew that he was disposing of it to the persons mentioned in the writing. Under the rulings of this court he therefore had sufficient capacity to make a will. [Hahn v. Hammerstein, 272 Mo. 248; Sayre v. Trustees of Princeton University, 192 Mo. 95; Southworth v. Southworth, 173 Mo. 59.] And when the evidence is measured by the principles laid down in the relevant adjudications of other jurisdictions as above set forth, we are led to conclude that he fully

understood and approved of the contents of the instrument in contest. We therefore rule that the trial court properly held the document offered to be the last will of Chris Nook.

III. Appellant assigns as error the action of the trial court in giving the peremptory instruction in the nature of a demurrer to the evidence. In support of this assignment appellant urges that "the evidence shows that there was some undue influence **Peremptory Instruction.** brought to bear upon him by his daughter, Lena Speigel, and her husband Andrew Speigel, to make the will in their favor; that the old gentleman was influenced, and that he executed the will under fear and on threats of his said daughter and her husband."

A scrutiny of the record discloses that Andrew Speigel did summon the witnesses to the will to the Nook home for the purpose of witnessing the instrument. The testimony shows, however, that the the time of the drawing and execution thereof neither Mr. Speigel nor his wife were present in the room. George Winkler testified: "The morning I went over to make the will, Mr. Speigel 'phoned me to come over; nobody came after me . . . When this will was formulated there, I do not know where Mr. Speigel was; he was not in the house. His wife, Mrs. Speigel, might have been in the house, but she wasn't in that room. . . . In my judgment his mental condition at that time was good, strong and vigorous. He knew all that we were doing there. The old gentleman told me what he wanted to do. And he named over the terms. . . . He said something to me that morning about an old will. He said he wanted to make a different will, and he told me his reasons why. He said that he was a great care, and that Lena, his daughter, was the only one that cared for him and that he wanted to protect her." Charles Winkler testified: "I was called there by Andrew Speigel. Lena Speigel

was in there just a few minutes, when I came there. Upon my arrival she departed in the other room. She wasn't in the room with us gentlemen after that. Andrew Speigel was not present at any time. After Mr. Van Meter came Mr. Nook said he wanted to make a will. . . . Pretty soon he told us the terms of the will. Lena was not present at the time of that conversation. She went to a different room. My brother closed the door. . . . I think he comprehended the extent of his property and all the persons of his bounty. He named nearly all his grandchildren. He suggested them all himself.''

J. W. Brown testified: ''Mrs. Spiegel was there at the place, and at the house, but not in the room. She was not in the room where Mr. Nook was and the terms of this will was not talked over there between us all, before he commenced dictating to the boys to be translated. . . . I think Mr. Nook understood what he was doing there at that time as well as he did any time I ever saw him, and I have known him for twenty years.''

Appellant Gust Nook testified that in the summer of 1917 he had a conversation with his father ''with reference to a will he had made. My wife was there and I believe my daughter. I came in the house and he commenced crying awful hard, and I say, 'Father, what is the matter?' 'Well,' he says, 'they made me change the will.' And I asked him who done it, who was the cause of it, and he said it was Andy Speigel and George Winkler came down to make him change it.''

Minnie Nook, daughter of appellant, testified: ''I was at the home of my grandfather about two or three weeks before he died. He was feeble; I was there two or three weeks after he made the will. He told us about making the will; he said, 'I was forced to make a will, they made me do it.' He cried like a child that day.''

Frank Nook, a son of the appellant, and John Nook also testified to the effect that the deceased had cried and told about having to change the will.

We have examined in detail all of the testimony as disclosed by the record which was before the trial court when the demurrer was interposed. The foregoing constitutes the most salient features of the evidence bearing upon the question of undue influence. As said by Fox, J., in Winn v. Grier, 217 Mo. 1. c. 459: "The influence exercised upon a testator sufficient to invalidate his will must be of such a nature and character as amounts to overpersuasion, coercion or force, destroying the free agency or will power, as contradistinguished from merely the influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected and trusted by the testator." In the instant case there was no evidence as to any coercion having been exerted at or prior to the time the will was executed, and the only approach to proof of undue influence was the testimony of parties in interest as to statements made by the deceased subsequent to the time the will was made. This evidence, in our judgment, was lacking in substantiality. Such being the case it was the duty of the court to direct a verdict for the respondents, proponents of the will. [Goedecke v. Lindhorst, 278 Mo. 504; Southworth v. Southworth, 173 Mo. 1. c. 73; Spencer v. Spencer, 221 S. W. 58; Defoe v. Defoe, 144 Mo. 458.]

IV. Appellant finally contends that the court erred in holding that there was no evidence of mental incapacity, insisting that the mind of the deceased was affected.

Testamentary Capacity. From the testimony hereinbefore reproduced it is patent that such insistence is wholly devoid of merit. And a close scanning of the record fails to reveal any evidence upon which such claim could successfully be predicated.

Dr. Richards, a practising physician of over twenty years experience, who had given nervous disorders partiular consideration, and who had spent two years in a hospital and insane asylum at St. Louis, testified that he had known the deceased for four or five years and had

treated his wife prior to her death; that he often observed Mr. Nook and stopped to talk to him; that he had visited him professionally in April, 1918, and his mental condition was good; that "he always knew me, knew what I had come for, and he told me what he thought I could do, and so forth. . . . This paralysis that we spoke about does not have any tendency to affect the mind much, until near the end. Of course, his vitality grows low and the mind might be affected some, but as I remember him he was clear up to the last. . . . His digestion and assimilation were pretty good. He couldn't have been as strong and vigorous in that respect and yet be mentally unbalanced, because he was not."

We are constrained to rule the point against appellant.

Having concluded the several questions presented by appellant, and entertaining the views herein expressed, it follows that the judgment of the trial court should be affirmed.

It is so ordered. All concur.