STATE OF MISSOURI, at the Relation of ANNA SMITH, Executrix of the Purported Last Will and Testament of JOHN J. SMITH, Deceased, and ANNA SMITH, Petitioners, v. WILLIAM C. HUGHES, EDWARD J. McCULLEN, and LYON ANDERSON, Judges of the St. Louis Court of Appeals of the City of St. Louis, State of Missouri.— No. 40149.—200 S. W. (2d) 360.

Court en Banc, March 10, 1947.

(1)

*Emmett Golden* for appellants Michael J. Smith et al.

*R. C. Brinkman* and *Watts & Gentry* for respondent.

 HYDE, J.—This is an action to contest the will of John J. Smith, deceased. The petition alleged undue influence and testamentary incapacity but the latter charge was abandoned at the close of contestants' evidence. The trial court then directed a verdict sustaining the will, and contestants appealed from the judgment entered to the St. Louis Court of Appeals.

The Court of Appeals (Anderson, J. dissenting) held that contestants made a jury case on the issue of undue influence and reversed and remanded the cause. [Smith v. Smith, 196 S. W. (2d) 5.] The case has been transferred here on application of defendant for certiorari on the ground of conflict of decision. We will determine it as on original appeal in accordance with our Rule 2.06. A very complete statement of the evidence will be found in the majority opinion in the Court of Appeals to which we refer for the details of the testimony. We make the following summary of the facts.

The testator and his wife Susan Smith were both born in Ireland and each came to this country when about 18 years old. They had been married 52 years when Susan Smith died October 7, 1934. They had four sons and two daughters then surviving and there were three grandchildren who were children of a deceased son. One daughter, Anna, is the proponent of the will, which left her everything except a bequest of $500.00 to the other daughter. The other five children and three grandchildren are the contestants. Testator started as a stonemason and later became a contractor. He had accumulated considerable property, mostly in real estate.

Anna never married and lived with her parents. All of the other children were married and had their own homes. Anna continued to live with testator after her mother's death. He made the will in question on February 28, 1936. He owned six pieces of improved real estate in St. Louis (houses and flats, some of which had been built by him) and one unimproved lot in St. Louis County. All of this property was in his wife's name at the time of her death and had been carried that way to protect him in his contracting business. The children understood this and signed a deed in August 1936 to convey all of these properties to him. They signed another deed for the same purpose in October 1936 because there was some mistake in the first deed. On March 12, 1937, testator executed a deed conveying all of this real estate to a straw party who then conveyed it to him and Anna jointly and not as tenants in common. Testator died February 7, 1938 at the age of 78.

Testator had for several years been afflicted with kidney and bladder trouble (nephritis) and also had prostate gland trouble; and his doctor had prescribed a special diet for him. He had been ruptured about fifteen years before his death and did not attempt to do heavy work thereafter. Nevertheless, he was active to the extent of walking to church alone, visiting his children at their homes

4

and places of business, going on long automobile trips with them, collecting rents from his properties and holding the position of secretary and treasurer of the Master Building Association, a contractors' organization for which he collected dues and kept accounts. He also helped to make repairs on the buildings he owned. He lived in an apartment in one of the flats he owned and had an office partitioned off in the basement where he had a desk and kept the books and records of his contracting business and property. He frequently signed notes at banks with his sons to help them in business or to buy property.

It is contestants' position that Anna completely dominated testator after her mother's death and that he did everything she told him to do. There was considerable testimony as to statements made by the testator about his home life and how he was treated by Anna. We will not set these out herein, but refer to the opinion of the Court of Appeals for them, because it is conceded that this evidence was not competent to prove the truth of any facts stated therein but was admissible only to show the testator's state of mind, his feelings toward his children and his susceptibility to influence. [Gibson v. Gibson, 24 Mo. 227; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46; Jones v. Thomas, 218 Mo. 508, 117 S. W. 1177; Gott v. Dennis, 296 Mo. 66, 246 S. W. 218; Frohman v. Lowenstein, 303 Mo. 339, 260 S. W. 460; In re Wayne's Estate, 134 Ore. 464, 291 P. 356, 79 A. L. R. 1427, and note p. 1447; 68 C. J. 1003, Sec. 774; 28 R. C. L. 153, Sec. 107.] In short, these statements cannot be considered in determining whether or not there was substantial evidence that the will was the result of undue influence. It is, therefore, necessary to consider the other testimony in the case to determine the sufficiency of the evidence to make a jury case on this issue.

This testimony was that Anna would watch testator when the other children were there to keep them from talking to him; that she would object to him smoking in the apartment so that he would have to go to his office in the basement to smoke; that when he had been out to collect rents Anna made him produce the money and he would turn the money over to her; that she would buy the household necessities; and that he had to ask her to get money for clothes, tobacco and other articles he wanted. There was also testimony that Anna would "snap him off," call him an "old fool," and never give him a civil answer; that she talked to him in a loud voice and would criticise him; that she would say he didn't know, that he should keep still and would speak to him unbecomingly; that she would call him down in front of the neighbors out in the yard; that she would keep him running down to the basement to fix the furnace and say that he was lazy; that she made him go out in bad winter weather to look at an apartment where a tenant was moving in; that she would object to what he ate and the way he ate; and that she would not give him

the food required for his special diet. There was testimony that Anna objected to testator helping the other children by giving them money or signing notes with them. However, it appears that he did sign notes with them in many instances. It was shown that testator and Anna had a joint bank account and that they both signed the checks. The inventory of his estate showed his bank account as $1941.21 at the time of his death. There was evidence that Anna was in poor health, went often to see doctors, stayed in bed frequently, had fainting spells and was sometimes hysterical; but one of her brothers gave it as his opinion that she was a faker and malingerer and that she would feign illness to get what she wanted from her father. Nevertheless, it was further stated that all members of the family were friendly with each other before testator's death, visited with each other, and frequently took testator and Anna on car rides. One of the brothers, who later married again, lived with testator and Anna during most of the year after their mother died. He paid six dollars per week to Anna for board. Testator would come over to his eldest son's store and visit with him on an average of once or twice a week. He took testator and Anna on a trip to Wisconsin in 1937 and testator told him about deeding away his property. At least two of the other children also said that testator told them about this transfer and said that it was done to save inheritance tax. None of them said they attempted to do anything to get him to change this during his lifetime.

The weakness of contestants' case is that whatever it may show as to domination of testator's personal conduct and home life, there is none shown in connection with the making of his will. [See 68 C. J. 1099, Sec. 920.] The will was prepared in February 1936 by R. C. Brinkman, an attorney, whom testator had also employed to defend a suit against him by someone who fell from a porch at one of the places he owned. When asked when that suit was brought Mr. Brinkman said: "It was after, long after that time that I drew his will." This suit was pending, however, for sometime after the will was made. He said that testator came to his office alone and told him fully what he wanted; that he made a memorandum of it and told him he would have it ready for him in a few days; and that he came back a couple of days later, on February 28th, and signed the will. He said that testator told him on his first visit that he was concerned about Anna; that she was sickly, and couldn't work; and that he wanted to take care of her and be sure that nothing happened to her. He also told him that his other children were doing well and had plenty, and that his wife had helped them during her lifetime. Mr. Brinkman stated that when testator came back on the 28th, he "gave him the original of the will, asked him to read it over very carefully, which he did"; that he then asked him: "if that was exactly the way he wanted the will prepared?" and "he said it was"; that

he asked him: "now do you fully understand that?" and he said "yes"; and that he further asked him: "are there [363] any corrections that you want made in it at all?" and he said "that is exactly the way I want it fixed." Mr. Brinkman said that Anna was not at his office on the day the will was signed.

However, Mr. Brinkman did represent Anna in a suit in which he took a default judgment on that date, and he said he met her at the court house. This came about in the following manner. Testator was administrator of his wife's estate. When the inventory was made certain deeds of trust aggregating $16,425.00 were found in a safety deposit box rented by her and Anna. These were included in the inventory of her estate with the notation that Anna claimed them as being held jointly with title to go to the survivor. At least one of her brothers (Edward) was present and heard her make this claim. Another brother (James) had moved into the apartment with testator and Anna, after his mother died, and lived with them about nine months until he married again. Testator said that Anna's claim was correct and that she was entitled to these trust deeds. She talked to Mr. Brinkman about it and he brought a replevin suit for them. She told him, and so testified at the trial on February 28th, that these joint purchases began in 1918, when she was working and owned liberty bonds, and that they were continued by reinvestment as long as her mother lived. Testator after being advised that he could not as administrator turn the trust deeds over to Anna without a suit, signed a statement that he believed Anna was the owner of the securities and that he did not desire to contest the suit. There was no testimony that any of the other children wanted to contest it.

■ . Thus there is no evidence that Anna ever suggested that testator make a will or had any idea that he would make a will, or knew that he had made a will, at or near the time when he made it, or even mentioned the subject of making a will to him or any one else prior to his death. Absent such evidence, a finding that testator's will was the result of her undue influence would rest solely on suspicion, speculation and conjecture. Contestants' evidence may show motive and opportunity to exercise undue influence, and an unequal or even unjust result, but under all the authorities that is not enough to make a jury case. [Walter v. Alt, 348 Mo. 53, 152 S. W. (2d) 135; Look v. French, 346 Mo. 972, 144 S. W. (2d) 128; Callaway v. Blankenbaker, 346 Mo. 383, 141 S. W. (2d) 810; Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S. W. (2d) 72; Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. (2d) 818; Nook v. Zuck, 289 Mo. 24, 233 S. W. 233; O'Reilly v. O'Reilly, Mo. App., 157 S. W. (2d) 220.] "It is not the existence of undue influence but the exercise of it in the execution of the will which invalidates such will." [Walter v. Alt, supra; Gibony v. Foster, 230 Mo. 106, 130 S. W. 314.] "Undue influence, to be effective in breaking a will,

must have been present, in active exercise, and sufficient to destroy the free agency of the testator at the time of the making of the will, so that the will is not, 'in fact his own will, but that of the party who was exercising the undue influence.'". [Beckmann v. Beckmann, supra.] Therefore, there is a failure of proof here on an essential element of contestants' case because, even if it be conceded that Anna had the power to exert an undue influence over the testator, there is no evidence that she exercised it to compel him to make the will or that the will was not as he desired it to be. In short, there is no proof of causal connection between any influence and the will.

It is true, of course, that such influence and its connection with the will may be shown by circumstantial evidence; and it is not necessary to show overt acts of undue influence at the very time the will was made. [Gott v. Dennis, 296 Mo. 66, 246 S. W. 218.] However, there would have to be circumstances of a sufficiently substantial nature to sustain an inference that Anna dominated and controlled the testator's mind in the making of the will so that it stated her wishes and not his. The circumstances in evidence are just as much lacking in this respect as is the direct evidence because they do not show that Anna had anything to do with the making of the will, or knew it was to be made or knew, at the time, it had been made. Thus in relying on circumstantial evidence, contestants get back again to nothing more substantial than suspicion and conjecture. It is significant that in all of the statements of the testator, to which the various contestants testified, there is no reference to a will or to the making of a will. They did disclose the making of the deed and were filled with complaints about Anna and how miserable his home life was; but he nevertheless refused offers which some of them said they made for him to live with them. Furthermore, contestants' testimony showed that he did continue to do what they say Anna opposed, namely: signing notes at banks for them and otherwise assisting them in their financial affairs. Moreover, it is unusual to have effective undue influence by being as unpleasant to the object thereof as contestants say Anna was. This is not the method advocated by an excellent authority on ''How to win friends and influence people.'' Cases in which it has appeared to work seem to be cases in which the mentality of the testator was inferior to that shown as to testator in this case. [See Rayl v. Golfinopulos (Mo. Sup.), 233 S. W. 1069.]

Contestants rely on Mowry v. Norman, 204 Mo. 173, 103 S. W. 15 and Coldwell v. Coldwell, 228 S. W. 95. In the Coldwell case, there was evidence of undue influence by a son-in-law on whom the testator greatly relied in all business matters. It was shown that he deceived testator into believing that a son (contestant) had received his full share so that he changed his will to leave him only five dollars.

8

This untrue statement was written into the will, which, while written when the son-in-law was not present, was made following this deception and was otherwise indicated by the evidence to be the result of it. The testator in that case was shown to have been in a weakened mental condition making him much more susceptible to influence than was true in this case. In the Mowry case, the court applied the discredited rule of a presumption from a showing of a confidential relationship (and it seems doubtful that there was a prima facie case without it, since the opinion comments on the weakness of the case) overruled by this court in Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772; see also Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400. Certainly, contestants' evidence in this case shows that the mental condition of testator herein was superior to that shown in either of those cases, and that he was, therefore, less susceptible to influence. He not only looked after much of his own business and helped his other children in financing their own affairs, in spite of Anna's claimed opposition, but also carried on the affairs of the contractor's association. Furthermore, the will apparently remained at all times in his possession in his office and there is no evidence that anyone else ever saw it, after the day of its execution, until after his death. Moreover, he was able to and did get away from his home and frequently talk to his other children alone. Considering contestants' evidence as a whole, we hold that it was not substantial evidence that the will was the result of undue influence and that the trial court properly directed a verdict sustaining the will.

The opinion of the St. Louis Court of Appeals is quashed and the judgment is affirmed. All concur.