R. E. HAMMONDS, H. H. Hammonds, R. L. Hammonds, E. W. Hammonds, Virgil Hammonds, Bertha Hammonds Sherwood and Blanche Hammonds Satterfield, Appellants,

v.

Lula HAMMONDS, Albert C. Shumway, Florence Shumway, Albert C. Shumway, Jr., and Margie Shumway, Respondents.

No. 45643.

Supreme Court of Missouri,

Division No. 2.

Jan. 14, 1957.

J. Grant Frye, Wm. H. Frye, Cape Girardeau, for appellants.

William B. Sharp, Malden, Robert A. Dempster, Sikeston, for respondents.

BARRETT, Commissioner.

This is an action in two counts; one, to contest the will of Josiah M. Hammonds and, two, to set aside two deeds to certain lots in the town of Malden in Dunklin County. Originally the appeal was to the Springfield Court of Appeals but the action and judgment involve the title to real estate and for that reason the appeal was appropriately transferred to this court. Hammonds v. Hammonds, Mo. App., 289 S.W.2d 903. Although the will was executed on May 20, 1949 and the deeds on January 5, 1944 and September 8, 1946, the parties stipulated that "in the event the verdict of the jury on Count I (is) adverse to plaintiffs then the issue in Count II would also be so decided by the court." And, while there was no evidence concerning the deeds other than the tacitly conceded fact of their execution and effect of transferring the title from Josiah M. Hammonds to Josiah and his wife, Lula, as tenants by the entirety, the court, in accordance with the agreement between the parties, after directing a verdict in favor of the proponents of the will, also found the issues on count two of the petition in favor of the defendants and accordingly entered judgment. In this connection see the previous appeals in the same action. Hammonds v. Hammonds, Mo.App., 255 S.W.2d 149; Hammonds v. Hammonds, 364 Mo. 517, 263 S.W.2d 348. The agreement may be rather unusual but was probably intended to mean, as will more clearly appear in the course of this opinion, that the evidence and theory upon both counts and issues would be the same and for that reason the decision upon the second count should abide the result and decision upon the first count and, there being no objection here by the parties, it is so treated for the purposes of this appeal. See and compare: State ex rel. Siegel v. Strother, Mo., 289 S.W.2d 73; Huegel v. Huegel, 329 Mo. 571, 46 S.W.2d 157; 50 Am.Jur., Sec. 18, p. 618.

The seven plaintiffs are Josiah's children by his first wife, Mary Jane. Their ages are not made to appear precisely, but they are all past forty and some of them are past fifty, having been born when Josiah was seventeen or eighteen. Josiah and Mary Jane were divorced in October 1911 and she was awarded the custody of the children and alimony. It does not appear just what happened to Josiah's second and third wives, but he was subsequently married to Eunice Jones and then to Ola, known to the plaintiffs as "Peaches." The defendants are Josiah's fourth wife, Lula, and her daughter by a former marriage and her husband together with their daughter and her husband. Josiah and Lula were married on July 6, 1925 and lived together thereafter until his death on May 29, 1949. He executed the contested will on May 20, 1949.

In the petition to contest the will it was alleged that Josiah lacked testamentary capacity and that the will was the result of undue influence and coercion exercised by his wife, Lula. There was

no evidence, however, that Josiah lacked testamentary capacity and that issue has been abandoned, tacitly. Upon the trial of the will contest Lula, who was the sole beneficiary, proved the due execution of the will, Josiah's testamentary capacity and, it may be added, that there was no undue influence or coercion in connection with its execution. At the conclusion of all the evidence the trial court, upon motion, directed the jury to return a verdict sustaining the will. It is claimed upon this appeal by the plaintiffs that the court erred in excluding certain offers of proof but the essentially meritorious question is whether, viewing all the facts and circumstances favorably to the plaintiffs, Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336, the trial court should have submitted the issue of undue influence to the jury. Mowry and Kettering v. Norman, 204 Mo. 173, 103 S.W. 15; Defoe v. Defoe, 144 Mo. 458, 46 S.W. 433.

According to the record, this particular will was drafted and executed on May 20, 1949, in these circumstances: Sometime after five o'clock on that day a lawyer's wife informed him that Florence Shumway, Lula's daughter, had said that he was to go by Judge Hammonds' house. He went to the house and Florence took him into the bedroom where Josiah was lying in bed. Lula was present, sitting in a chair, and Florence was in the doorway. Uncle Joe spoke to the lawyer and said, "he wanted me to write a will." Lula "spoke up" and said, "Joe, you don't need another will, you have got one." Lula produced the old will, the lawyer examined it, returned it to Lula, and told Josiah that the will he proposed was the same as the old one. Josiah, nevertheless, said, "I know what I am doing and I have my own reasons and I want you to write me another will." According to the lawyer, Lula left the room and he talked to "Uncle Joe" privately for a few minutes then went to his office and drafted the will. He returned with the will, told Florence to get some witnesses, and Josiah was propped

up in bed and signed the will, after the lawyer read it to him, and three neighbors and the lawyer signed as witnesses. Lula returned to the room and requested Mrs. Batson, one of the witnesses, to read the will. Mrs. Batson read it and Mr. Batson said, "Now, Joe, that is the way you want it?" and Joe said, "Yes." Then, referring to his children, Joe said, "they would put that poor paralyzed woman out in the cold if you would let them." The lawyer handed the executed will to Lula and departed. Josiah was suffering from a serious "prostatic condition" for which he had steadfastly refused surgery. He died on May 29, 1949, and this action was instituted in December 1949.

It is contended, apart from the excluded testimony, that the reasonable inferences from the evidence admitted and the circumstances in which the will was executed are of such probative force that a jury could find that Josiah's will was the result of undue influence exercised by his wife, Lula. Of course, a wife may be guilty of such undue influence as to invalidate her husband's will. 57 Am. Jur., Sec. 359, p. 263. She may, however, urge and solicit her husband, perhaps even importune him, to make a will in her favor and the fact that she procured the scrivener and was present when the will was executed do not support an inference of undue influence. 2 Page, Wills, Sec. 822, p. 627; Snell v. Seek, supra. The value of Josiah's personal estate is not made to appear, nor is the value of the lots in Malden shown. It was claimed that certain property he had inherited from either his mother or his Uncle Charlie in California in 1927 was of the value of $35,000 to $50,000, but it does not appear that this property is involved in either the deeds or the will; it was said to have been owned by Josiah and Lula jointly since 1927. But, the fact that a husband bequeaths all of his property to his wife to the exclusion of his children by a former marriage is not an unnatural disposition, even though they may not then be living to-

gether happily. While the fact of an unequal distribution of property may be a relevant circumstance, it does not support the inference of undue influence. 57 Am. Jur., Sec. 399, p. 286; Snell v. Seek, supra; Look v. French, 346 Mo. 972, 144 S.W.2d 128. Proffer was made of an unwitnessed holographic will dated November 28, 1944, in which Josiah disposed of his property "in accordance with the laws of the states in which situated." The will immediately preceding the one in contest was not offered in evidence but the fact that these two latter wills made the same disposition of his property is of some significance and tends to repel the suggestion of undue influence. Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135. Admittedly, undue influence need not be proved·by direct evidence, it may be shown circumstantially, Welch v. Welch, 354 Mo. 654, 190 S.W.2d 936, and it may be exercised and operative even though the person exercising it was not present at the time the will was executed. Taylor v. Wilburn, 20 Mo. 306; Coldwell v. Coldwell, Mo., 228 S.W. 95. "Nevertheless, to invalidate the will the undue influence 'must have been present, in active exercise, and sufficient to destroy the free agency of the testator at the time of the making of the will, so that the will is not "in fact his own will, but that of the party who was exercising the undue influence." ' " Baker v. Spears, 357 Mo. 601, 611, 210 S.W.2d 13, 18; Walter v. Alt, supra.

In addition to the terms of the will and the circumstances in which it was executed the contestants introduced the testimony of six or seven witnesses and it is urged that their evidence supports the inference of undue influence. One witness, a taxicab driver and part-time town marshal, said that Lula called him about eleven o'clock on the night of May 19, 1949, the day before the will was executed. He went to the house and found Josiah on the floor, unable to use his arms or legs and unable to take a drink of water. He put Uncle Joe in bed and tried to talk to him but was of the opinion that Uncle Joe did not recognize him. Another witness, "Uncle Dan" Bradley, aged eighty years, saw Joe one afternoon about four o'clock, upon his memory being refreshed by an "affidavit" he had given the contestants, he fixed the date as May 20th. He said that he talked to Joe but Joe never said a word "and I felt his pulse as he laid across the bed. * * * He might have been asleep." The postmaster testified, even though mail was delivered to the home in Malden, that six years before his death Josiah rented a box in the post office and instructed him to put his personal mail in the box and let no one other than his son Virgil have access to it. Josiah's half-sister, Mrs. Hall, who lived in California, testified that she had not seen or heard of her brother since 1927, "didn't know if he was alive," and so on her way to Illinois stopped to see him in 1944 and again in 1948. She "understood I couldn't see my brother without some sort of arrangements to get to see him away from the house" and she had a man at the bus station call and ask him to come to the bus station, ostensibly on a matter of business. They thus met surreptitiously and Joe told her to wait until he had been home a reasonable length of time and then she could come down, "I know Lula will be glad to see you." She went down and stayed about an hour but was not asked, pointedly as she thought, to stay all night. Before she left Joe told her that if she ever wanted to contact him "the only way you can do it is through Box 528 only and he didn't tell me why." On the second trip in 1948 she again contacted him through the man at the bus station because she wanted some information concerning a birth certificate for herself. He came to the bus station but said he couldn't help her, "He said, nobody in God's earth knows what I am going through. * * * I must go, I am in danger." But later Joe called her from the house, "His voice was of a man who was terror stricken, he told me to come as quick as we could and we went immediately." They stayed about

an hour on that occasion and Lula talked to her but "Mostly she was after him because he deserted her about going to town on business but the man didn't know what the business was." Another witness, a groceryman, testified that about five years before his death his daughter, Bertha Sherwood, was "in needy circumstances" and Josiah made arrangements with the groceryman to let Bertha have some groceries and told him "to keep quiet and not let Lula know it." Fletcher Pitts, a barber, offered to testify that "from a year to six months" before his death Joe told him that Lula only allowed him "so much money to spend in the barber shop" and he couldn't go over that. Dan Davis, the plaintiffs' cousin, offered to testify that when Josiah ran for magistrate of Dunklin County in 1946 he told the witness that he had saved $500 in notary fees while justice of the peace but that he hid the money behind the bath tub and Lula found it and would not let him spend it in the campaign. (Incidentally, Uncle Joe was defeated in the primary election.) This same witness also offered to testify that when he was Constable and Uncle Joe was Justice of the Peace, in 1946, Joe sent messages by him to some of his children telling them that he wanted to see them but always instructing them just when and how to approach the house. But when they got there Lula wouldn't let any of them in except Bertha and Blanche and that only after prolonged parleys out on the porch.

■ This is not to say that all this evidence was relevant or admissible, it is only considered here for the purpose of determining whether the trial court appropriately directed a verdict for the proponents of the will. Larkin v. Larkin, Mo., 119 S.W.2d 351, loc. cit. 357. This evidence and these circumstances may demonstrate that Lula had but little use for the plaintiffs and that she watched, as carefully as she could, over Joe's finances but it is not pointed out how they support the inference of Lula's undue influence in

the execution of his will. Beckmann v. Beckmann, 331 Mo. 133, 52 S.W.2d 818; Ketchum v. Stearns, 8 Mo.App. 66; Id., 76 Mo. 396; Look v. French, supra. Obviously, Mr. Hammonds was very ill when he executed his will and the fact is a relevant circumstance, Snell v. Seek, supra, but standing alone it does not support the inference of undue influence. Larkin v. Larkin, supra. The evidence may support the inference that Lula dominated Josiah's home life, his personal conduct, and even his association with his children by his first wife. She had a motive for influencing him and she had the opportunity. But these circumstances, either singly or in combination, do not support the inference that she did, in point of fact, unduly exercise her influence in the drafting and execution of this particular will. State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W. 2d 360.

Through one of the sons and one of the daughters the plaintiffs sought to introduce in evidence twenty-three letters, postcards, and memoranda dated 1946, 1947, 1948, all surreptitious communications from Josiah to his sons, his daughters, a brother and a half-sister. In the first of these, a letter to Bertha in California, he said, "You are 50: I am 67: little time left for rancor or bitterness and I sincerely propose to you we foreget *both* forever—I need to trust you. May I do so with something indescribably important whose betrayal would cause me untold suffering, and my children incalculable damage—Think *well*. If I may safely and for a lifetime do so, write me and mail in the enclosed envelope —Your want-to-be Dad." In another note he warned Bertha, "Keep all secret till I die, girl, for if Lue found it out I would be ruined—I am trusting you—." With this note he enclosed a memorandum addressed "To The Honorable Court trying a case to be brought by my daughter, Bertha Sherwood, after my death—." In part, this memorandum said, "Be it known that my wife, Lula Hammonds, who has power over me, has this day compelled me

against my will to *so make* a grant deed to my property I was given from my mother's estate in Los Angeles, Calif. * * * It is my request hereby to The Honorable Court that this deed be set aside and made of none effect by you—thus reverting the title to my estate and letting my children possess it, whom I desire shall do so, after my death:— My wife has already been amply provided for by real estate in Missouri and Illinois, plus a pension, as my widow, from the government (presumably a Spanish-American War pension)—But she wants *all,* and demands my children be cut off without anything. I beg your Honor to thwart this, her unjust design, by setting aside the deed this day mailed to your recorder of deeds in Los Angeles." Appended to this document was a postscript to Bertha urging her to preserve the memorandum until after his death and then to bring a suit to set aside the deed "to myself and Lue, as joint tenants with right of survivorship." He again cautioned her to secrecy to the end that Lue would not learn of it as "that would be a blow to me from which my diseased heart would not recover—So keep silent till I die and then act—for I *want you children to have all what I have*—." Included with the offered exhibits was a deed by which title to the property in California was transferred to Josiah and his wife, Lula, on February 14, 1946.

Other letters requested certain of his children to come and see him as Lue had learned of their presence and "won't let me out in town for fear I might see you. * * * Your *Miserable Captive,* Dad." In other letters he expressed his love for his children and his desire that "I may have all my children their husbands and wives and all my grandchildren in one great gathering in my own home in one great feast of eats and happiness and joy, without the demoralizing presence of her who keeps us apart today." In a letter to Bertha in December 1947 he "smuggled" a gift of fifty cents to her children, and in

another three dollars. In a note to one of his sons he said, "Forty eight years ago today I received my discharge at Savannah, Georgia and started joyfully for a home I would gladly give this whole world today to have kept." In a letter addressed to "Mary" he said, "49 years ago next Wednesday I came home to 3 of the sweetest kiddies and the best wife in the world. Next to having her and them and those that came after with me again, which I hope and pray may still be, would be a letter in her own dear hand writing to me—." In March 1947 he wrote to Bertha and told her that he could not communicate with his brother John, "I am not double-crossing even *Lue.* I am protecting myself while living, and the interests of my children as soon as I am gone."

 It has often been said that the declarations of a testator, not made contemporaneously with the execution of his will, are not competent as direct or substantive evidence of the truth of the matters therein stated when offered on the issue of undue influence inducing the execution of the will. Annotation 79 A.L.R. 1447, 1449; State ex rel. Smith v. Hughes, 356 Mo. 1, 4, 200 S.W.2d 360, 361. Such declarations, provided they are not too remote in view of the issues and the circumstances, annotation 124 A.L.R. 433, may show the testator's state of mind, his expressed affection for his children, or even his susceptibility to undue influence. Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S.W. 46; Gott v. Dennis, 296 Mo. 66, 246 S.W. 218; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842. It could be observed, parenthetically, that Uncle Joe's expressions of love for his children and regard for his first wife were just a little belated. Appended to his first wife's divorce decree is the notation, "Dad got too far behind in the payments after he married his second wife, Eunice Jones of Malden, Mo. and mother sued him for back alimony and they compromised Nov. 22nd, 1915 on that date at Kennett, Mo." Then, too, much of this correspondence relates to his property in California and

not to his last will. But the most important factor, often overlooked or not carefully adhered to in considering the relevancy and competency of hearsay evidence, in general, in will contest cases, is that such hearsay declarations are only admissible when there is independent substantive evidence of undue influence, only then has the requisite foundation for such evidence been laid. Annotation 79 A.L.R., loc. cit. 1471–1478; Gibson v. Gibson, 24 Mo. 227; Fulton v. Freeland, 219 Mo. 494, loc. cit. 523, 118 S.W. 12, loc. cit. 20. "In short, these statements cannot be considered in determining whether or not there was substantial evidence that the will was the result of undue influence." State ex rel. Smith v. Hughes, 356 Mo. loc. cit. 4, 200 S.W.2d loc. cit. 361. This fact, as has been stated, that there was no independent evidence of undue influence in the execution of this will may be sufficient to dispose of the appellants' claim that the court erred in rejecting this and other hearsay evidence, even though it has been given some consideration here in determining whether the trial court should have directed a verdict. Larkin v. Larkin, supra.

It was the plaintiffs' theory, however, by reason of certain occurrences prior to their marriage in 1925, that Lula acquired the means of dominating Josiah's life and that forever after she exercised the means and did dominate his entire life including the execution of his will on May 20, 1949. It is urged that all the rejected evidence is corroborative of the fact and that the court erred in excluding the evidence relating to these certain occurrences. In short, it is sought to bring the facts of this case within the facts and principles of the frequently cited case of Gott v. Dennis, supra. There is no occasion or disposition to criticize or minimize that case and its force in the trial of certain will contests. The instance itself, however, of a mature man's being enticed from his pregnant bride of thirty days by his spinster sisters, his mother and a brother and being continuously coerced and unduly influenced

thereafter, including the making of his will forty-eight years later, is indeed unique. That case is distinguishable from this one in the single fact that this case of supposed undue influence involves a husband and his fourth wife whose marriage endured twenty-four years, despite its sordid and inauspicious origin. It must be conceded that Dennis expressed less interest in his child than Uncle Joe did in his children,— at least during the last three or four years of his life. Although it does not appear, except for his seeing one daughter and the half-sister in California in 1927, that Uncle Joe ever mentioned or had anything to do with his own children until 1946, for some of them a period of over fifty years.

In any event, the occurrences which are said to have given Lula the undue influence which she continuously exercised for the ensuing twenty-five years are these: The plaintiffs offered in evidence the minute entries of a justice of the peace court and the Circuit Court of Dunklin County in a case styled, "State of Missouri v. J. M. Hammonds." · These records, from October 25, 1923, to November 24, 1924, show that Lula Blackburn was the complaining witness and that Uncle Joe was the defendant upon a charge of attempted rape. There was an affidavit for a continuance in which Uncle Joe alleged that certain absent witnesses would testify that Lula had told them certain lurid details showing that the charge of attempted rape was false. He alleged that she told some of the witnesses "that she would get him herself" and "did not propose for that old woman to get those houses." These records finally certify that the case was "nollied."

On May 24, 1924, Lula gave birth to another child, christened Billy Gene Blackburn. This child died on August 15, 1924, a doctor certifying that the cause of death was "acute gastroenteritis," "malnutrition" being a contributing cause. One of the daughters, who was about thirteen years old when Billy Gene was born, offered to testify that she and her mother, then thinking

that Lula was "a nice woman," paid her a sick call. After a few minutes' pleasant conversation Lula said, "Blanche, here is your little half-brother, George claims him but he belongs to Joe." On April 25, 1925, after service by publication, Lula obtained a divorce from her husband, G. W. Blackburn, and the custody of three minor children. Josiah and Lula were married on July 6, 1925. One of the sons, Virgil, was anxious to testify that in 1937, "just before he disappeared," he had a conversation with his father about a crime "he was supposed" to have committed, of which Lula and her daughter had knowledge. In this conversation Josiah is reported to have said that he had "to deed all his property and will everything he had to Lue and her children to keep out of prison." In Virgil's "affidavit" he said that his father told him that "Lue and Florence have been blackmailing me since before I married Lue. Lue tricked me into violating the Man (sic) Act Law by staying all night with her at Piggott, Ark. and she had some witnesses planted there in a room at the hotel * * * to testify against me. I told my attorney * * * about this when Lue threatened to put me in prison if I didn't buy her a house at Illmo, and (he) advised me to marry her to stop her from putting me in prison, that she would keep on blackmailing. Lue made me get rid of my wife 'Ola' ('Peaches') and marry her. I had to frame 'Ola' to get rid of her. I had the F. B. I. (sic?) Agents to come and buy some 'Dope' from Ola to get her out of my way, to keep out of prison myself. Lue made me do this under her blackmail threat."

In addition, according to the "affidavit" of proposed testimony by Virgil, his father told him that "Lula and Florence also threatened to swear on the witness stand that I killed her baby, 'Billy Gene Blackburn' too." But, he is reported to have said, "She is the one that killed that baby, she put poison in the baby's milk and it slowly killed the baby from injury to the baby's bowels and stomach. She didn't want to stay home to take care of the baby and wanted it out of her way, so she could run around."

It is not necessary to comment on and analyze these facts and circumstances and the oral testimony offered in connection with them. Hearsay declarations by the beneficiary in a will may be relevant and material upon the issue of undue influence, annotation 167 A.L.R. 13, 99, but it is doubtful that the statement Lula is said to have made to Blanche and her mother concerning Billy's paternity is the type of declaration against interest contemplated by the rule admitting such evidence. In any event, this particular declaration of Lula's, the charge of attempted rape and Joe's transporting Lula to Arkansas for immoral purposes all had to do with illicit sexual relations antedating their marriage and does not support the inference that the sexual relations were exerted as undue influence in the execution of this will twenty-five years later. Fulton v. Freeland, supra; Ketchum v. Stearns, supra; 2 Page, Wills, Sec. 827, p. 634. Again, there being no independent evidence of undue influence, the additional hearsay evidence and declarations were not of such probative force in the particular circumstances as to support or sustain the claim of undue influence in the execution of Josiah's will on May 20, 1949. State ex rel. Smith v. Hughes, supra; Look v. French, supra; Fulton v. Freeland, supra.

Accordingly the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.